COMMONWEALTH *vs.* BEN SEAY.

Suffolk. October 4, 1978. — December 4, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Firearms. Practice, Criminal,* Comment by prosecutor, Instructions to
· jury.

The carrying of a firearm within one's residence or place of business without a license to carry by one having a valid firearm identification card does not violate G. L. c. 269, § 10 (*a*). [738-742]

General Laws c. 269, § 10 (*a*), prohibits the unlicensed carrying of a firearm in a foyer or other common area of an apartment building by one who merely happens to rent an apartment therein. [742-743]

At the trial of an indictment charging the defendant with unlawfully carrying a firearm in violation of G. L. c. 269, § 10 (*a*), evidence that the defendant had possession of the firearm in the foyer and stairway area of his apartment building was sufficient to warrant the denial of his motion for a directed verdict. [737-743]

At a criminal trial, comments by the prosecutor, in his discussion of the defendant's evidence of entrapment during final argument, with respect to the absence of evidence concerning the defendant's frame of mind did not improperly call the jury's attention to the defendant's failure to testify. [743-745]

A judge at a criminal trial did not err in including in her instructions on reasonable doubt a negative definition by explaining what it was not. [745-746]

INDICTMENTS found and returned in the Superior Court on June 24, 1977.

The cases were tried before *Griffin*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Willie J. Davis* for the defendant.

*John W. Gibbons*, Assistant District Attorney (*Leonard A. Lucas* with him) for the Commonwealth.

QUIRICO, J. The defendant was convicted of unlawfully carrying a firearm, selling a firearm, and selling ammunition for a firearm. See G. L. c. 140, §§ 122B, 128; G. L. c. 269, § 10 (a). In this appeal he challenges the trial judge's denial of his motion for a directed verdict on the carrying charge. In addition, he raises issues stemming from the prosecutor's alleged comment on his failure to testify and from the judge's charge to the jury relative to the reasonable doubt standard. We find no error.

The facts are not in dispute and are simply stated. In April, 1976, Special Agents of the Bureau of Alcohol, Tobacco, and Firearms of the United States Treasury Department began an investigation of gun traffic in the Grove Hall section of Boston. About 9:30 A.M. on June 16, 1977, Special Agent Philip Cook, another special agent and an informer drove to the Grove Hall apartment building where the defendant lived. They went there in order to purchase a revolver from the defendant. The defendant and another person (friend) were on the steps of the apartment building when Cook arrived. Leaving his companions in the car, Cook walked over to the defendant and, at the defendant's direction, he entered the foyer of the apartment building.

While Cook waited in the foyer, the defendant went around a corner in the building and down some stairs. After a few minutes, the defendant returned and directed Cook downstairs to the first landing. The defendant then produced a .32 caliber revolver and six rounds of ammunition for it. Cook agreed to pay $75 for the revolver and ammunition. Cook accompanied the defendant's friend outside to Cook's car and obtained $75 from the other

special agent. The friend took the money, walked back to the apartment building, and gave the money to the defendant. Cook got into the car and drove away.

For his participation in these events, the defendant was indicted for unlawfully carrying a firearm, for illegally selling a firearm, and for illegally selling ammunition. A jury convicted the defendant on all three indictments. The judge imposed the mandatory one-year sentence for the carrying offense and a six-month sentence, to be served concurrently, on the ammunition-selling offense and placed the third conviction on file. The defendant appealed, and we ordered the case transferred to this court. G. L. c. 211A, § 10 (A).

1. The major issue before us on this appeal is whether the judge should have granted the defendant's motion for a directed verdict on the charge of unlawfully carrying a firearm. The sole question raised by the motion for a directed verdict is whether there was sufficient evidence of the defendant's guilt to warrant the submission of the case to the jury. The test is whether the evidence, in its light most favorable to the Commonwealth and notwithstanding the contrary evidence presented by the defendant, was sufficient to permit the jury to infer the existence of the essential elements of the crime charged. *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975).

Prior decisions of this court construing G. L. c. 269, § 10 (*a*), have established that "carrying" a firearm occurs when the defendant knowingly has more than momentary possession of a working firearm and moves it from one place to another. *Commonwealth* v. *Albano,* 373 Mass. 132, 134-135 (1977). *Commonwealth* v. *Morrissey,* 351 Mass. 505, 512 (1967). *Commonwealth* v. *Fancy,* 349 Mass. 196, 204 (1965). Cf. *Commonwealth* v. *Atencio,* 345 Mass. 627, 631 (1963) (momentary possession during game of Russian roulette not "carrying"). But cf. *Commonwealth* v. *Ballou,* 350 Mass. 751, 756 (1966) ("carrying" found where recited facts showed only stationary possession in public place), cert. denied, 385 U.S. 1031

(1967). In addition, we have held that the defendant has the burden of producing evidence to show that he was licensed or otherwise permitted to carry a firearm. *Commonwealth* v. *Jones*, 372 Mass. 403, 406-407 (1977).

The judge correctly denied the defendant's motion for a directed verdict. There was evidence of the following. The defendant had possession of the revolver in the foyer and stairway area of his apartment building prior to the time he sold and delivered it to Cook. The revolver was in evidence, and the jury could determine for themselves how long the barrel was. See G. L. c. 140, § 121 (defining "firearm"). There was evidence that the revolver was capable of firing bullets. Because he sold the revolver to Cook, the defendant surely knew that he had it on his person. The defendant offered no evidence that he was licensed or otherwise permitted to carry the revolver. There was, therefore, sufficient evidence to permit the submission of the case to the jury on the charge of unlawfully "carrying" a firearm.

The defendant argues, however, that he dealt with the revolver in such close proximity to his own dwelling that the Legislature could never have intended imposition of the mandatory one-year jail sentence inserted in G. L. c. 269, § 10 (*a*), by St. 1974, c. 649, § 2. He would therefore have us construe the verb "carry" to apply only to conduct occurring on a public street. The Commonwealth argues, on the other hand, that "carrying" a firearm within the meaning of the statute may occur within the common areas of an apartment building such as the foyer and stairway involved in this case. We agree with the Commonwealth's position on this issue.

It is helpful in approaching this question of statutory construction to summarize briefly the Massachusetts scheme for handgun control. The revolver involved here is encompassed by the statutory word of art "firearm." G. L. c. 140, § 121. Except as provided in the firearm licensing laws, anyone who "carries [a firearm] on his person, or carries [one] on his person or under his control

in a vehicle" is subject to a one-year jail sentence without possibility of parole or other release except for rigidly prescribed purposes. G. L. c. 269, § 10 (a).[1] In addition, anyone who "owns [or] possesses" a firearm commits a criminal offense unless he first complies with the licensing laws. G. L. c. 269, § 10 (h). A qualified individual may obtain a "firearm identification card" under G. L. c. 140, § 129B, that allows him to possess a firearm legally. G. L. c. 140, § 129C. G. L. c. 269, § 10 (h). To lawfully "carry" a firearm within the Commonwealth, however, a person must either obtain a license to do so under G. L. c. 140, § 131, or be exempt from the normal licensing requirements under G. L. c. 140, §§ 129C, 131F, or 131G, none of which is applicable to this case.[2] The statutes governing

---

[1] As amended through St. 1978, c. 175, § 1, G. L. c. 269, § 10 (a), provides: "The sentence imposed upon such person [who unlawfully carries a firearm] shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection (a) be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct until he shall have served one year of such sentence; provided, however, that the commissioner of correction may, on the recommendation of the warden, superintendent, or other person in charge of a correctional institution, or the administrator of a county correctional institution, grant to an offender committed under this subsection a temporary release in the custody of an officer of such institution for the following purposes only: to attend the funeral of a relative; to visit a critically ill relative; or to obtain emergency medical or psychiatric services unavailable at said institution. Prosecutions commenced under this section shall neither be continued without a finding nor placed on file." We have previously upheld the sentencing provisions of § 10 (a) against a variety of constitutional challenges. Commonwealth v. McQuoid, 369 Mass. 925, 928 (1976). Commonwealth v. Jackson, 369 Mass. 904, 924-925 (1976).

[2] The exemption contained in G. L. c. 140, § 129C, fourth par. (c), for a person surrendering a firearm to a licensing authority, is the only statutory exception that even comes close to covering the facts of this case. We note, however, that Special Agent Cook was not authorized to license the defendant to carry or possess a firearm, that the defendant gave no written notice of his intention to surrender the revolver, and that the defendant must have believed Cook to be an illicit purchaser. In these circumstances, the exemption is inapplicable. See Commonwealth v. McQuoid, 369 Mass. 925, 926 (1976) (affirming conviction for carrying unlicensed firearm from home to licensed dealer

the possessing and carrying of firearms make no distinction among places that might help us resolve the issue before us.[3]

Notwithstanding the silence of directly relevant statutes, other portions of the licensing laws do contain an implicit exemption from criminal liability for one who has a firearm identification card and carries a firearm within his residence or place of business. Any person who is neither an alien, a felon, nor a drug offender and who can demonstrate a "proper purpose" may obtain a license to purchase, rent, or lease a firearm under G. L. c. 140, § 131A.[4] Together with a firearm identification card this permit makes it legal for a Massachusetts resident to

for purpose of sale); *Hines* v. *United States,* 326 A.2d 247, 248 (D.C. 1974) (absence of criminal intent necessary to defense of temporary, innocent possession).

[3] General Laws c. 140, § 129C, ninth par., as appearing in St. 1969, c. 799, § 8, provides in part that "[a]ny person who, while not being within the limits of his own property or residence, or such person whose property or residence is under lawful search, and who is not exempt under this section, shall on demand of a police officer or other law enforcement officer exhibit his license to carry firearms, or his firearm identification card . . . . Upon failure to do so such person may be required to surrender to such officer said firearm . . . ." The same section also provides, however, that "[n]othing in this section shall prevent any person from being prosecuted for any violation of this chapter." We construe the quoted language merely to establish limits for searches and seizures by law enforcement personnel and not, as might be thought, to permit a person who has neither a license to carry nor a firearm identification card to carry a firearm "within the limits of his own property or residence." Compare St. 1969, c. 799, § 8 (amending G. L. c. 140, § 129C, to include quoted language), with 1969 Senate Doc. No. 785, § 8 (bill that became c. 799 lacked reference to property or residence).

[4] In contrast to G. L. c. 140, § 131A, which requires an applicant for a permit to purchase to show a "proper purpose." G. L. c. 140, § 131, requires an applicant for a license to carry to demonstrate "that he has good reason to fear injury to his person or property or [has] any other proper purpose." We need not decide whether § 131 mandates a more stringent investigation than does § 131A so that, for example, a person might purchase a firearm on showing an objectively groundless need for self-defense that would be insufficient to warrant issuing a license to carry.

obtain, and for a licensed dealer to sell or lease, a firearm. G. L. c. 140, §§ 123, Eighth, 131E. A licensed dealer may not, however, *deliver* a firearm so purchased or rented except to a purchaser licensed to carry a firearm or to an unlicensed purchaser at his "residence or place of business." G. L. c. 140, § 123, Seventh. It is therefore possible for a person not licensed to carry a firearm to obtain possession of one within his "residence or place of business" without violating the law.

The provision allowing a licensed dealer to deliver a firearm to the residence or place of business of a person not licensed to carry a firearm was added by St. 1957, c. 688, § 7, apparently in response to a study by the Department of Public Safety commissioned by the Legislature the previous year. See Res. 1956, c. 64. Prior to the 1957 amendments, it was at least unclear whether an unlicensed person could carry a firearm within his residence or place of business.[5] The department's report noted, however, that "there are many citizens throughout the State who will wish to purchase a firearm for the protection of their homes, but who will not desire a license to carry the weapon." 1957 House Doc. No. 3705, at 50. To accommodate such citizens and simultaneously ensure that only persons licensed to carry firearms could leave a dealer's store with a firearm, the department recommended the amendments that allow a dealer to

[5] We have found no judicial decision considering whether an exemption from licensing requirements permitted a person to carry a firearm in his home or business prior to 1957. There is, however, some indication that the Legislature intended no such exemption in 1906, when it first enacted gun control legislation. Specifically, the bill originally filed in 1906 would not have affected "the rights of any person to deal in or carry concealed weapons at his place of business or in his usual place of abode." 1906 House Doc. No. 671, § 3. As enacted, the bill prohibited the unlicensed "carrying" of a loaded pistol or revolver without regard to where the conduct occurred. St. 1906, c. 172, § 2. The intention of the 1906 Legislature is not, however, determinative of the present inquiry in light of the clear expression of intention we find behind the 1957 amendments.

deliver the firearm to the home or business of an unlicensed purchaser. See *id.* at 28.

We think it clear that the Legislature intended in 1957 to exempt persons who would keep a firearm only in their homes or places of business for self-protection from the requirement of obtaining a license to carry. It is plainly unreasonable to suppose that the Legislature intended a lawful possessor to be penalized for carrying a firearm within the very place to which a dealer may lawfully deliver it. There is no indication whatever that the Legislature intended St. 1974, c. 649, which added the mandatory jail sentence to the carrying offense, to modify or repeal this exemption. Accordingly, we conclude that carrying a firearm within one's residence or place of business by one having a valid firearm identification card is not a criminal offense.

The exemption we have found does not avail the defendant in this case, however. In States whose gun laws contain explicit exemptions for carrying guns in dwellings and the like, the courts have unanimously held the exemption inapplicable to common areas over which the defendant lacks exclusive control. *People* v. *Overturf*, 64 Cal. App. 3d Supp. 1, 6-7 (1976). *Hines* v. *United States*, 326 A.2d 247, 249 (D.C. 1974). *Doerr* v. *State*, 351 So. 2d 56 (Fla. App. 1977). *People* v. *Wilson*, 29 Ill. App. 3d 1033, 1036 (1975). *Dunbar* v. *State*, 162 Ind. App. 375, 378 (1974). *Commonwealth* v. *Goosby*, 251 Pa. Super. Ct. 326, 333-334 (1977). *Bryant* v. *State*, 508 S.W.2d 103, 104 (Tex. Crim. App. 1974). In *State* v. *Davidson*, 217 N.W.2d 630 (Iowa 1974), the court said that so limiting the exemption "is the only realistic interpretation [because t]he rule for which defendant contends would permit one to wander [armed with a firearm] about apartment buildings inhabited by hundreds of persons simply because his own living quarters were located somewhere in the recesses of that same building." *Id.* at 632. The interest of an apartment dweller in defending himself—the only apparent reason for allowing him to carry a firearm in his own dwelling

in the first place—is clearly attenuated when he passes his doorway to enter a common area offering easy retreat. Cf. *Commonwealth* v. *Shaffer,* 367 Mass. 508, 511 (1975) (right of self-defense by deadly force conditioned by duty to use "all reasonable and proper means in the circumstances to avoid combat"). In addition, the motive of public protection and crime deterrence that surely underlay the 1974 enactment of a mandatory sentence applies with equal force in the public area of an apartment building and in a public street. For all of these reasons, we hold that G. L. c. 269, § 10 (*a*), prohibits the unlicensed carrying of a firearm in a foyer or other common area of an apartment building by one who merely happens to rent an apartment therein. We further hold that denial of the defendant's motion for a directed verdict was proper.

2. The defendant also complains before us that the judge should have declared a mistrial following the prosecutor's summation. In discussing the defendant's evidence of entrapment, the prosecutor twice emphasized the absence of evidence concerning the defendant's frame of mind.[6] The defendant argues here, as he did below, that

---

[6] We reprint the relevant portion of the prosecutor's summation with the challenged portions italicized:

"Mr. Davis [the defense attorney] says, well, the fellow was entrapped. He told you yesterday when he made an opening that you would hear evidence, unique type evidence which would show how the Government had induced this individual, *and the evidence he put on was Clayton Felder.*

"Now the defense has an absolute right to put on no defense. The defendant has an absolute right to remain silent, or they can put on anything they want, but if they put on evidence or a witness, then you have got to look at that pretty carefully.

"Now, Mr. Davis has talked and talked about Benjamin Seay's predisposition. *The only person he put on was Clayton Felder, and Clayton Felder never told you a thing about Benjamin Seay....* [Felder testified that] 'these guys were out there buying guns, anybody had a gun they can sell it. They were making big money out there.' Well, that was what Clayton Felder said.

"*Now, what was his frame of mind? Clayton Felder didn't know, couldn't care.* He just passed the word around that he had gotten and he knew the word was on the street....

these remarks called the jury's attention to his failure to testify and thereby impermissibly burdened his exercise of the privilege against self-incrimination secured by the Federal and State Constitutions. See *Griffin* v. *California*, 380 U.S. 609, 615 (1965); *Opinion of the Justices*, 300 Mass. 620, 625 (1938).

Considering the prosecutor's remarks in their total context, see *United States* v. *Haynes*, 573 F.2d 236, 239 (5th Cir. 1978), we find no impropriety. The *Griffin* rule, which prohibits judicial or prosecutorial attempts to suggest unfavorable inferences from a defendant's silence, was designed simply to keep the exercise of the privilege against self-incrimination from becoming useless. *Griffin* v. *California, supra* at 614. *Michigan* v. *Tucker*, 417 U.S. 433, 441 & n.14 (1974). As the Supreme Court recently said, "Griffin prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter* v. *Palmigiano*, 425 U.S. 308, 319 (1976). In the context of an argument on the weakness of the defendant's entrapment defense, the prosecutor's remarks lacked this forbidden tendency. By raising the defense, the defendant placed his predisposition to commit the crimes charged in issue, *Commonwealth* v. *Miller*, 361 Mass. 644, 651 (1972), and it is difficult to imagine a summation that would ignore the evidence concerning that subject. Moreover, the prosecutor confined his remarks to pointing out the unpersuasiveness of the defense evidence; he did not ask the jury to infer from the defendant's silence that the defendant was predisposed. Compare *United States* v. *Hooker*, 541 F.2d 300, 306-307 (1st Cir. 1976), with *Desmond* v. *United States*, 345 F.2d 225, 227 (1st Cir. 1965).

. . . .

". . .*Well, Mr. Davis told you he was going to give you evidence of entrapment. I suggest to you he gave you no evidence of what Benjamin Seay's frame of mind was.* He's telling you that the Government has shown you no evidence that the man was involved in that business."

Even if the prosecutor's summation might have led the jury to speculate on the meaning of the defendant's silence, we think that the judge's instructions, given shortly after the challenged remarks, were sufficient to avoid prejudice. *Commonwealth* v. *Gouveia,* 371 Mass. 566, 572 (1976). *Commonwealth* v. *Lussier,* 364 Mass. 414, 424 n.3 (1973). See *United States* v. *Sigal,* 572 F.2d 1320, 1323 (9th Cir. 1978) (error harmless where oblique comment on silence avoided stressing inference to be drawn and where no substantial evidence of innocence existed); *United States* v. *MacDonald,* 455 F.2d 1259, 1262 (1st Cir.) (no prejudice from inadvertent comment not relied on to confirm case where curative instructions given at close of summation), cert. denied, 406 U.S. 962 (1972). In this case, the judge instructed the jury that the defendant had an absolute right to remain silent and that they were to draw no inference from the defendant's silence. Because the prosecutor avoided characterizing his evidence as uncontradicted or otherwise inviting the jury to infer guilt from the defendant's silence, we have no occasion to decide whether the judge should have interrupted the argument immediately to give curative instructions. Cf. *United States* v. *Flannery,* 451 F.2d 880, 882 (1st Cir. 1971).

3. Finally, the defendant argues that the judge's charge defined "reasonable doubt" in a way that subtly lessened the Commonwealth's burden of proof.[7] We note that the

---

[7] The judge charged the jury as follows: "Now, what is a reasonable doubt? What is proof beyond a reasonable doubt? Well, it is not proof beyond all doubt nor proof beyond a whimsical fanciful doubt, nor proof beyond a probability of innocence because there is rarely a case so clear that it could be proved beyond the possibility of innocence. A reasonable doubt is not that doubt which may exist in the mind of a man or a woman who is seeking a doubt or an excuse to acquit a defendant. A reasonable doubt means a doubt that remains in the minds of reasonable men and women who are earnestly seeking the truth. A fact is proved beyond a reasonable doubt when it is proved to a moral certainty. It must be proved to that degree of certainty that satisfies your judgment and your consciences as reasonable men and

charge contained none of the analogies to daily life that we found offensive in *Commonwealth* v. *Ferreira*, 373 Mass. 116, 129-130 (1977). The judge defined proof beyond a reasonable doubt in terms of "moral certainty" and "clear and settled conviction." In addition, the judge contrasted reasonable doubt with "whimsical fanciful doubt" and with the doubt of a person "who is seeking a doubt or an excuse to acquit a defendant." The judge thereby essentially paraphrased the classic definition we gave in *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). Our cases require no more. *Commonwealth* v. *Grace, ante* 499, 500 (1978). *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 492 (1977). *Commonwealth* v. *Fielding*, 371 Mass. 97, 116-117 (1976).

Relying on *United States* v. *Shaffner*, 524 F.2d 1021 (7th Cir. 1975), cert. denied, 424 U.S. 920 (1976), the defendant nonetheless maintains that it was improper for the judge to give a negative, or exclusive, definition of reasonable doubt by explaining what it was *not*. See *id.* at 1023 & n.2. The objectionable language in *Shaffner* appeared, however, in conjunction with language that invited the jury to think about the management of their daily affairs and omitted mention of the "moral certainty" ingredient of the present instruction. Moreover, the Seventh Circuit court did not find the error in giving the questionable instruction severe enough to justify reversal. We therefore find *Shaffner* unpersuasive in the present instance.

4. For the foregoing reasons, we hold that there was no error in the trial below and that the judgments should be affirmed.

*So ordered.*

women and leaves in your mind a clear and settled conviction of guilt. If, after evaluating all of the evidence, there remains in your minds any reasonable doubt of the existence of any element of the crime charged, then the defendant must have the benefit of that doubt and he must be acquitted."