## Commonwealth *vs.* Daniel K. Ferreira.

Bristol. April 8, 1980. — August 6, 1980.

Present: Hennessey, C.J., Quirico, Braucher, Wilkins, & Abrams, JJ.

*Homicide. Evidence,* Intent, State of mind. *Error,* Harmless. *Practice, Criminal,* Argument by prosecutor.

At a murder trial in which the main issue was whether the defendant or his companion, who was a key prosecution witness, had committed the murder, the judge did not abuse his discretion in limiting to impeachment purposes only a witness's testimony that ten days before the crime the companion had asked the witness where he could get a gun. [310-311]

At the trial of a defendant charged with the murder of a policeman in which the main issue was whether the defendant or his companion, who was a key prosecution witness, had committed the murder, the defendant was not prejudiced by the judge's limitation to impeachment purposes only of a witness's testimony that the companion had said shortly before the murder that he was going to shoot a policeman before the night was out where there was direct testimony by two witnesses to the murder that the defendant did the actual shooting and there was no testimony that the companion had done the shooting. [311-314]

At a murder trial, the defendant was not prejudiced by a police officer's testimony that the defendant did not respond when asked if he understood the Miranda warnings. [314]

Taken in context, remarks made by the prosecution in a murder case during closing argument did not constitute an improper comment on the defendant's failure to testify or an improper expression of personal belief in the defendant's guilt. [315-317]

Indictment found and returned in the Superior Court on August 13, 1973.

After review reported in 373 Mass. 116 (1977) a retrial of the case was held before *Taveira,* J.

*Daniel E. Callahan* for the defendant.

*William A. Schroeder,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree for the slaying of Officer John Ruggiero, a member of the Fall River police department, Daniel K. Ferreira appeals to this court pursuant to G. L. c. 278, §§ 33A-33G. On appeal Ferreira argues three assignments of error: (1) that the judge erred in his rulings which limited to impeachment purposes only evidence on a material issue showing state of mind of the Commonwealth's main witness; (2) that the judge erred in allowing the defendant to be impeached by his silence when he was given Miranda warnings; and (3) that improper closing argument by the prosecutor requires reversal. We find neither reversible error nor any reason to exercise our power under G. L. c. 278, § 33E, to enter a verdict of a lesser degree of guilt or to order a new trial, and therefore we affirm.

At trial, the main issue was whether one Joseph Silva or the defendant committed the homicide.[1] We summarize the evidence concerning the identification of the defendant. In support of its contention that Ferreira was the person responsible for killing Officer Ruggiero, the Commonwealth offered two eyewitnesses to the crime: Officer Robert Fortin and Joseph Silva.

In the early morning hours of July 23, 1973, Officer Fortin saw a police cruiser driven by Ruggiero drive by him and make a U-turn. The cruiser was following a black Cadillac automobile which had its headlights out. After the Cadillac turned, it went into a parking lot; the police cruiser stopped in the middle of the street adjacent to the parking lot. The area was fairly well lighted.

Two men ran from the Cadillac toward the cruiser. The shorter of the two men (later identified as the defendant) was at least one-and-one-half feet ahead of the taller man (later identified as Silva). The defendant reached the cruiser first. When the shorter man was about four inches from

---

[1] The defendant has previously been tried and convicted for Ruggiero's murder. This conviction was reversed in *Commonwealth* v. *Ferreira*, 373 Mass. 116 (1977). Then, as now, the main issue was whether the defendant or Silva committed the homicide.

the side view mirror of the cruiser, Fortin heard four or five shots and saw flashes go from the middle of the shorter man (the defendant) into the cruiser. Although Fortin did not see a gun in the hands of either man, his testimony was that all the flashes originated from the shorter man (the defendant).[2] The two men ran back to the Cadillac as the police cruiser rolled downhill. The Cadillac left the parking lot and drove toward Fortin.

Fortin, who had known both Silva and Ferreira for a number of years, recognized Silva as the driver and the defendant as the passenger. As the car passed Fortin at a distance of ten to fifteen feet, the defendant pointed a gun at Fortin but did not fire it. Fortin ducked behind a car and emptied his gun, shooting at the Cadillac, hitting the taillight and the trunk; the car continued down the street at a speed of fifty to seventy miles an hour. As a result of Fortin's radio messages, two officers on cruiser patrol saw the Cadillac and gave chase.

After the officers lost sight of the Cadillac for a few minutes, the car was found parked on the street near the apartment building where Silva resided. Ferreira was apprehended hiding in the grass about five feet from the car. The gun used in the slaying was found on the opposite side of a six-foot fence, approximately eight feet from where the defendant was arrested.

Silva testified for the Commonwealth as to the following facts. He and the defendant had been together drinking all day and into the evening of July 22. Silva was driving a Cadillac which he had recently purchased. After the bars closed, both men continued drinking at the homes of friends, one of them being Frank Souza. They then proceeded to Ferreira's apartment to pick up Silva's girl friend, Margaret Strickland.

The defendant went into the apartment alone and came out five or ten minutes later, waving a gun. The defendant

---

[2] Stippling (gunpowder burn marks) on Officer Ruggiero indicated that he was shot at close range, and that the gun was fired at a distance of not more than three feet from the officer.

suggested they continue drinking and both men got back into the car. Silva drove a few blocks when he noticed a police car behind him. Silva made a right turn, hoping the cruiser would not follow him. When it did, he turned into a parking lot.

Both Silva and the defendant got out of the Cadillac and went toward the police car, the defendant some five or six feet ahead of Silva. When Ferreira reached the window of the police car, Silva saw Ferreira fire several shots into the car. Silva was still some distance behind the defendant. After the defendant fired, both men turned and ran back to the Cadillac. Silva drove back to his apartment, left the defendant sitting in the car outside, and remained in his apartment until the police arrived a couple of hours later. Silva admitted on cross-examination that he had received his Class 1 license (permitting him to operate a tractor-trailer) a few months prior to July 22, and he believed that if he were convicted of driving under the influence of alcohol he would lose his driver's license, including his Class 1 license. When he turned into the parking lot, he intended to ask the police officer to give him a break if he promised to go to the apartment of a friend in the building next to the parking lot and leave his car there. He therefore had a reason to get out of his car to talk to the police officer. He testified that the defendant had no such reason, and said that Ferreira shot Ruggiero simply because Ferreira was "nuts."

The defendant did not testify, but he did present witnesses on his behalf. Robert Luiz testified that about ten days before the crime Silva asked him where he could get a gun. Luiz responded that he did not know. Frank Souza testified that when both Silva and the defendant were at his house an hour or two before the shooting, Silva lifted up his shirt, showed Souza a gun, and said: "These cops are on my ass, and I'm going to shoot a f---ing cop before the night is out." [3] The defendant was in the bathroom when this episode took place.

---

[3] On cross-examination Silva denied that he had been looking for a gun prior to the Ruggiero killing. He also denied having a gun earlier in the evening or having made any statement regarding a police officer.

1. The testimony of both Luiz and Souza regarding the statements allegedly made by Silva were admitted in evidence for impeachment purposes only. The jury were specifically instructed by the judge in the charge that these statements could not be considered as affirmative evidence. Defense counsel was precluded from arguing the statements as probative evidence. The evidence regarding Silva's possession of a gun was admitted for its full probative value. The defendant claims that it was error to limit the testimony of Souza and Luiz as to Silva's statements solely to their impeachment value. The Commonwealth asserts that the limitation placed on this testimony was within the judge's discretion.

Statements, not too remote in time, which indicate an intention to engage in particular conduct, are admissible to prove that the conduct was, in fact, put in effect. "The existence in the mind of a deliberate design to do a certain act, when once proved, may properly lead to the inference that the intent once harbored continued and was carried into effect by acts long subsequent to the origin of the motive by which they were prompted." *Cook* v. *Moore,* 11 Cush. 213, 217 (1853). A statement indicating intent "is not excluded by the hearsay rule; either it is not hearsay, or it is within an exception to the hearsay rule." *Commonwealth* v. *Wampler,* 369 Mass. 121, 123 (1975). "[T]he nature of the act to be evidenced by the design has nothing whatever to do with the admissibility of declarations of design. The latter are absolutely admissible as statements of a mental condition . . . to prove the design; what the design evidences, or whether it is relevant at all, does not affect [the admissibility of the declarations]." 6 J. Wigmore, Evidence § 1725, at 139 (Chadbourn rev. 1976). See *Commonwealth* v. *Wampler, supra; Commonwealth* v. *Fiore,* 364 Mass. 819, 824 (1974); *Goldman, petitioner,* 331 Mass. 647, 651 (1954), cert. denied sub nom. *Goldman* v. *Fogarty,* 348 U.S. 942 (1955); *Commonwealth* v. *Rubin,* 318 Mass. 587, 588-589 (1945); *Commonwealth* v. *Trefethen,* 157 Mass. 180, 192-193 (1892). See also McCormick, Evidence § 295, at 697 (2d ed. 1972); W.B. Leach & P.J. Liacos, Massachu-

setts Evidence 249 (4th ed. 1967).[4]  See Proposed Mass. R. Evid. 803 (3) (July, 1980).

Tested by this well-established principle, there was no error in limiting Luiz's testimony.  A request for a gun is not a declaration of intent.  The statement, moreover, does not tend to show that Silva intended to kill a police officer. Rather, it merely implied a desire for a gun, an issue collateral to the issue being tried.  See *Commonwealth* v. *Hodge* (*No. 2*), 380 Mass. 858, 862-863 (1980).  Thus, the judge did not abuse his discretion in concluding that the statement was not indicative of a state of mind relevant to a material issue at trial.  Lastly, the judge could well conclude that the statement was too remote in time to evidence an existing state of mind.  There was no error.

We next consider the limitation on Souza's testimony. Ferreira grounded his defense on the theory that Silva committed the murder.  Since the Commonwealth offered no evidence of joint enterprise,[5] a finding that Silva fired the shots resulting in Officer Ruggiero's death mandated a finding of not guilty for the defendant.  It was in effect a necessary corollary to the Commonwealth's case that Silva did not shoot Officer Ruggiero.  Where the evidence tended to show that both possible perpetrators had the same opportunity, evidence of the intent of either one of them is clearly material.[6]  The statement of intent made by the only other

---

[4] The case of *Commonwealth* v. *Keizer*, 377 Mass. 264 (1979), relied on by the defendant, is not controlling in this case.  In the *Keizer* case, evidence of a third party's possible commission of the crime of which the defendant stood accused was admissible to inform the jury of the existence of a third party who had committed similar crimes.  The rationale in *Keizer* is relevant when the defense is one of mistaken identification.  In any event, in the case at bar, the substance of the defendant's claim that the police were mistaken in charging him with the crime was brought to the jury's attention.  Compare *Commonwealth* v. *Graziano*, 368 Mass. 325, 329-330 (1975).

[5] At oral argument the Commonwealth claimed that it had no evidence of joint venture.

[6] In the similar factual situation present in *Commonwealth* v. *Trefethen*, 157 Mass. 180 (1892), the exclusion of evidence of a drowning victim's declaration of intent to drown herself was held to be error.  In

possible perpetrator of the murder is material evidence and normally is admissible.

We now consider whether the limitation placed on the evidence of state of mind amounted to an abuse of discretion. Two witnesses to the shooting identified the defendant as the person who did the shooting. Officer Fortin testified that he saw the shots come from the shorter man,[7] who was later identified to be the defendant. Silva testified that he was five or six feet behind the defendant when the defendant started shooting. Officer Fortin saw a gun in the defendant's hand as the Cadillac drove toward him, and the gun used in the homicide was found eight feet away from the area where Ferreira was apprehended. Ferreira was identified as the person closer to the cruiser. Powder burns on the victim's body indicated that the person who shot Officer Ruggeiro was within three feet of the officer. Although the testimony of Officer Fortin and Silva differed as to the distance between Silva and the defendant, both men testified that Silva was behind the defendant and that the shots came from the defendant.

Additionally, the jury knew that Souza claimed that Silva had a gun in the early morning hours prior to the shooting, that only Silva stood to lose his Class 1 license if arrested for driving under the influence of intoxicating liquors, and that

that case, we said that "[i]f, on a trial for murder, the defendant proved that another person had ill will towards the deceased, and had an opportunity to commit the murder, and was found on the day when the murder was committed near the place of the murder under suspicious circumstances, with a weapon which might have been the instrument with which the deceased was killed, and that the conduct of this person after the murder was such as to indicate that he had committed it, it would seem that evidence that this person on the day before the murder had threatened to kill the deceased if he could find him, and had said that he was searching for him that he might kill him, would be significant of an intent to kill him, and ought to be admitted, and we find no well considered case where, on this state of facts, such evidence has been rejected." *Id.* at 192-193.

[7] This was Fortin's steadfast testimony at the second trial, although at the first trial his testimony was that he could not tell which of the two men fired the shots. *Commonwealth* v. *Ferreira*, 373 Mass. 116, 118 (1977).

if they believed Souza, it would impeach Silva.[8]  Additionally, Silva's credibility was discredited by his record of many criminal convictions.

We think, therefore, this case may be distinguished from *Commonwealth* v. *Trefethen, supra* at note 6, in which there was no direct evidence as to the actual killing and in which the jury were wholly ignorant of the defendant's claim.  The evidence at issue in the instant case only tended to show that Silva intended to kill a police officer.  That statement was not inconsistent with a finding that the defendant had a similar intent or that the defendant did the actual shooting.

In the appeal from the first trial in this case, we noted that "a classic duel of credibility" existed between Silva and the defendant, each testifying to the other's guilt.[9]  *Commonwealth* v. *Ferreira,* 373 Mass. 116, 127 (1977).  In this trial, however, no such duel existed.  There was no testimony that Silva, and not the defendant, had done the shooting.  Therefore, in the face of direct testimony by two witnesses to the murder that the defendant did the actual shooting, the limitation on testimony regarding the alleged intent of another person earlier that night, albeit one of the witnesses, to do the shooting was, if error, harmless beyond a reasonable doubt.[10]

---

[8] In essence, when Silva testified that he did not say that he intended to shoot a police officer, he created a situation in which evidence impeaching this testimony was logically equivalent to evidence asserting substantively that Silva did make such a statement, and the jury could use that evidence in judging Silva's credibility.

[9] At that time each was charged with murder in the first degree.  By the time of retrial, the indictment for murder in the first degree had been nol prossed against Silva.

[10] We do not decide whether nonconstitutional error is fatal if it is "harmless" but not "harmless beyond a reasonable doubt."  See *Commonwealth* v. *Hanger,* 377 Mass. 502, 511 n.8 (1979).  The defendant attempts to make out a constitutional claim.  However, this is not a case where the defendant has been denied either the right to confront or cross-examine witnesses or call them on his own behalf.  There has, therefore, been no denial of due process.  Cf. *Chambers* v. *Mississippi,* 410 U.S. 284, 294 (1973).  A determination that there may have been error in the limi-

2. The defendant argues that it was constitutional error for the trial judge to allow a police officer to testify that the defendant did not respond when asked if he understood the Miranda warnings. We find no error. The short and sufficient answer to the defendant's argument is that at no time did the Commonwealth use this single response either as evidence of guilt or to impeach an explanation subsequently offered at trial. Cf. *Doyle* v. *Ohio*, 426 U.S. 610 (1976); *Commonwealth* v. *Cobb*, 374 Mass. 514, 516-519 (1978). The testimony was elicited during a recounting of the events subsequent to the shooting and was directed at the defendant's understanding of what had been said. The witness's reference was not repeated by the prosecutor nor linked to the question of who shot Officer Ruggiero. Any possibility of the jury's drawing impermissible inferences was negated when the jury were instructed that no inferences should be drawn from the defendant's silence in the face of Miranda warnings.[11] Finally, on this record, any error that might have occurred in the admission of this single response would be harmless beyond a reasonable doubt.

---

tation of evidence does not mandate a conclusion that the defendant was denied due process of law or that such error is constitutional. To determine whether such error is of constitutional dimension, the excluded or limited evidence must be considered in light of the effect of the exclusion or limitation on the jury. *Chambers* v. *Mississippi, supra* at 298. The holding in *Green* v. *Georgia*, 442 U.S. 95 (1979), is not controlling here. In *Green*, the excluded evidence, the only direct evidence which exculpated the defendant, was totally withheld from the jury. In this case, unlike *Green*, the defendant did put to the jury facts showing that earlier that night Silva had a gun, that Silva, not Ferreira, had a reason to shoot the officer, and that Silva had the opportunity to commit the crime. Finally, in this case the limited evidence, had it been admitted fully, merely would have bolstered the defendant's theory that in addition to Silva's concern over loss of his driver's license Silva entertained a general intent to harm a specific group. On these facts, we cannot conclude that the defendant was denied due process of law or that any error was constitutional.

[11] The judge's instructions in this regard were likely prompted not by the admission of this one response during the eight-day trial, but by the fact that the defendant in cross-examination of a police officer elicited evidence that in response to the Miranda warnings (at the police station) Ferreira said that he wanted to talk to an attorney before making a statement.

3. The defendant also claims that during his closing argument the prosecutor[12] commented on the defendant's failure to testify, and that reversal is therefore required. There is no doubt that reference to a defendant's failure to testify at trial is improper. *Commonwealth* v. *Smallwood,* 379 Mass. 878, 892 (1980). Taken in context, however, the remarks in the present case reflect an effort to summarize the evidence rather than any attempt to comment on the failure of the defendant to testify. The relevant portion of the argument is set out in the margin.[13] The prosecutor ceased that line of argument as soon as it was objected to by

---

[12] The assistant district attorney on appeal was not the Commonwealth's trial counsel.

[13] THE PROSECUTOR: "You know, in the final analysis, the case you have heard over these eight days of trial comes down to depending on what you believe happened on Boutwell Street. And the only evidence that you have actually heard, the only evidence that you have actually heard of what happened that night back in July, of 1973, came from two witnesses for the government — Officer Robert Fortin and Jo-Jo Silva.

"And although they were villified and criticized and attacked on their credibility, and although they were accused of telling untruths and lying directly to you, there wasn't any evidence offered to you —"

DEFENSE COUNSEL: "I object to this line of argument, respectfully."

THE PROSECUTOR: "This is argument, Your Honor."

THE JUDGE: "No, but I will have to explain the absence of testimony of the defendant, if that's what you are driving at."

DEFENSE COUNSEL: "That is, Your Honor, what I am driving at."

THE PROSECUTOR: "I haven't made any reference to the defendant."

DEFENSE COUNSEL: "In the context of this trial, that's the only way it could be interpreted, that line of argument."

THE JUDGE: "I certainly will instruct the jury as to the right of the defendant to testify or not testify."

THE PROSECUTOR: "Your Honor, may I finish my argument?"

THE JUDGE: "Go ahead. But I think [defense counsel] was under the impression you were going to relate to the failure of the testimony —"

THE PROSECUTOR: "I am not going to mention anybody. I have told the only evidence we have heard of what happened that night came from Jo-Jo Silva, as he said himself, and Robert Fortin."

DEFENSE COUNSEL: "My exception to that line of argument."

THE PROSECUTOR: "Robert Fortin told you that two men reached the car, ran to a car; that the short one in shorts was near the window of the car. Robert Fortin told you that the other man stood behind him two to three feet. Robert Fortin said he saw the flashes come from the middle of the short man into the car. . . ."

the defendant. The argument as a whole was within permissible bounds. See *Commonwealth* v. *Storey*, 378 Mass. 312, 323-324 (1979); *Commonwealth* v. *Seay*, 376 Mass. 735, 743-745 (1978). Furthermore, during his instructions, the judge instructed the jury that no inference could be drawn from a defendant's failure to testify. The judge's instructions were sufficiently clear and complete to negate any possible prejudice to the defendant. *Commonwealth* v. *Seay*, *supra* at 745.

We repeat that "[i]n closing argument, counsel may argue the evidence and the fair inferences which can be drawn from the evidence." *Commonwealth* v. *Hoffer*, 375 Mass. 369, 378 (1978). Counsel may also attempt to assist the jury in their task of analyzing, evaluating, and applying evidence. Such assistance includes suggestions by counsel as to what conclusions the jury should draw from the evidence. Counsel may "fit all the pieces of evidence together so that they form a comprehensive and comprehensible picture for the jury." *Commonwealth* v. *Haas*, 373 Mass. 545, 557 n.11, quoting from Bowler, Oral Argument in Criminal Prosecution, 52 J. Crim. L. 203 (1961). But counsel "may not attempt to have the jury draw inferences from the accused's decision to exercise [a constitutional right]." *Id.* at 561.

The defendant also claims to find prosecutorial misconduct in the fact that during his closing argument the prosecutor expressed a personal belief in the defendant's guilt. In the absence of exceptions below,[14] we read the argument as

---

[14] There was one objection to one such statement during the prosecutor's summation but no exception was taken. The judge stated that he would inform the jury that the opinion of counsel was to be disregarded. The judge instructed the jury as follows: "Belief or opinion of counsel is not to be considered by the jury. It is the jury's province to make a determination of belief, whom you are going to believe. And if a lawyer in arguing his case suggests to you that he believes this or has an opinion of this or that or the other, it has been stated by eminent authorities that it is not the belief or the opinions of counsel, the suggestions of counsel, as to what might have occurred or might not have occurred that is controlling. It is rather the jury's determination to make from the evidence and from the inferences that are properly to be drawn from the evidence and for the jury to arrive at its belief or conclusions." The record does not disclose any discontent with the judge's course of action or with his instructions.

a whole to determine whether it so unfairly prejudiced the defendant as to cause a miscarriage of justice. See *Commonwealth* v. Garcia, 379 Mass. 422, 439 (1980).

It is clear that a prosecutor's statement as to his personal belief in a defendant's guilt is improper argument. *Commonwealth* v. *Earltop,* 372 Mass. 199, 203 (1977). We have too frequently had occasion to rule on similar statements.[15] We disapprove such personal comments by either counsel in closing argument. The remarks in the instant case were, however, argumentative rather than an indication that the prosecutor had personal knowledge of the defendant's guilt. Without detailing the specific instances where the prosecutor used the pronoun, "I," a reading of the summation makes it abundantly clear that the prosecutor was summing up the best case for the Commonwealth and not expressing his personal belief as to the defendant's guilt. Read as a whole, the argument, while inartful, was not unfairly prejudicial. Moreover, the judge instructed the jury that the belief or opinion of counsel was not to be considered by the jury. See note 14, *supra.* In these circumstances, there is no error.

We reiterate our admonition that "[m]embers of the bar, however, would be most ill-advised to consider that each departure from the norm which is not so grievous as to precipitate a reversal of a conviction sets a new and less elevated standard for lawyers' behavior." *Commonwealth* v. *Johnson,* 372 Mass. 185, 197-198 (1977).

4. The defendant suggests that, taken in combination, the errors he alleges require that we exercise our extraordinary power pursuant to G. L. c. 278, § 33E, and grant a

---

[15] *Commonwealth* v. *Daigle,* 379 Mass. 541, 550 (1980) ("I think on all the evidence it is overwhelming that this man is guilty . . . and I think that's the way you should find"). *Commonwealth* v. *Stone,* 366 Mass. 506, 516 (1974) ("I *submit* . . . their stories are honest . . . . I think we have to come to the conclusion that they were telling the truth" [emphasis in original]). *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 537 (1971) (prosecutor's statements as to his personal belief in the defendant's guilt).

new trial. We think that the defendant was fairly tried and that there is no reason to order a new trial. Consonant with our duty under § 33E we have reviewed the record and the transcript and nothing therein warrants entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*