COMMONWEALTH *vs.* EUGENE ALBERT.

Suffolk.  January 12, 1984. — May 15, 1984.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Self-Defense. Malice. Practice, Criminal,* Instructions to jury. *Words,* "Dwelling."

At a murder trial the judge's instruction to the jury with respect to the defendant's claim of self-defense presented no occasion for relief under G. L. c. 278, § 33E, either because the instruction on self-defense was given toward the end of the judge's charge or because the issue of self-defense was not explained separately as part of the instruction on each crime of which the defendant might be found guilty. [857-859]

A judge's occasional use of the words "finding" or "feeling" in his instructions to the jury in a murder case, although disapproved, did not, when considered in context, shift the burden of proof. [859]

At a murder trial the judge properly instructed the jury that they were permitted to infer malice from the defendant's intentional use of a deadly weapon. [859-861]

At a murder trial the judge properly instructed the jury that, when considering the defendant's claim of self-defense, they were to employ an "objective" standard with respect to the defendant's apprehension of danger and his reaction to the threat. [861]

At a murder trial the judge properly instructed the jury that a "dwelling" for purposes of applying G. L. c. 278, § 8A, to the right of an apartment dweller to defend himself, "cannot reasonably be said to extend beyond . . . [the tenant's] own apartment and perhaps any separate areas subject to his exclusive control." [861-862]

INDICTMENT found and returned in the Superior Court Department on June 25, 1982.

The case was tried before *James P. Donohue,* J.

*Henry D. Katz* for the defendant.

*Margaret Steen Melville,* Assistant District Attorney (*Timothy M. Burke,* Assistant District Attorney, with her) for the Commonwealth.

LYNCH, J. The defendant was convicted of murder in the first degree, on November 24, 1982, and was sentenced to life imprisonment. He now appeals, and requests that we exercise our power under G. L. c. 278, § 33E, to order a new trial or to direct the entry of a verdict of a lesser degree of guilt.

The defendant alleges that the trial judge's instructions to the jury were deficient in that they (1) failed to place the burden of proof regarding self-defense and provocation clearly on the prosecution, (2) invaded the jury's fact-finding function by suggesting an inference of malice from the intentional use of a deadly weapon, and (3) employed improperly an "objective" standard of behavior and wrongly defined the scope of the defendant's "dwelling" in connection with the charge on self-defense. The defendant's only objections at trial were based upon the latter two contentions with respect to the self-defense charge. We find no error in this regard. We have considered the other arguments individually and collectively, and we find no "showing of grave prejudice or substantial likelihood that a miscarriage of justice has occurred." *Commonwealth* v. *Roberts*, 378 Mass. 116, 123 (1979). Therefore, we decline to exercise our power under G. L. c. 278, § 33E, and we affirm the judgment below.

Natalie Harvey is the mother of the victim's (Anthony Brooks') one year old daughter and the defendant's five year old son. At the time of the incident, Harvey and her two children were living with the victim. On the afternoon of March 27, 1982, according to her testimony, Harvey rebuked the victim for not spending enough time with her and with their daughter. At the conclusion of the argument, the victim said, "Since you getting on me, I'm going to get on Gene" (referring to the defendant). The victim had been drinking that day. The victim, Harvey, and the two children drove to the defendant's home in Roxbury, where the defendant lived with his mother. Resisting her attempts to prevent his leaving the car, the victim left Harvey and the children there and went up to the defend-

ant's second floor apartment. Harvey remained in the car for about five minutes watching through a hallway window what appeared to be a heated discussion between the defendant and the victim. After this interval, Harvey left the car and entered the building. Reaching the first landing, she observed and heard what was now a loud exchange of words between the defendant and the victim.

At this point, the testimony given by Harvey, and by the defendant and his mother, diverges significantly regarding the nature of the ensuing confrontation. Harvey saw the defendant reenter his apartment, and at some point during the argument the victim stuck his foot in the door, and "[t]hen somehow the door got closed." The victim started down the stairs. The defendant's mother then opened the door and the victim went back up to the apartment, introducing himself as "Tony." Harvey then observed the defendant's mother "holding her arms out like she was holding somebody back." The victim was heard to say, "You want to go outside?" and he again started to walk down the stairs. At the time, Harvey was on the first landing; a second later she looked up and saw the defendant stabbing the victim in the back with a knife. The victim then turned around and was stabbed in the forehead, according to Harvey's account. After this attack, the victim managed to stagger outside, where he fell. The defendant and Harvey also went outside. Harvey testified that the defendant then kicked the victim as he lay on the ground. About five minutes later, the police arrived.

The defendant's and his mother's accounts of the confrontation are similar, although they vary significantly from Harvey's observations. The defendant testified that the victim arrived at his apartment, and, after knocking loudly on the door, told the defendant "[l]ike he was in a real hurry," that he needed to speak with him. The defendant, who was partially dressed, asked the victim to wait a minute, and he went back into the apartment to put on his shoes and a shirt. When the defendant returned to the hallway, the victim told him again to "[h]urry up," and then stated quite categorically to the defendant, "I'll kill you." The defendant testified that he did not believe the

victim at first; however, the victim repeated this threat several times, and began to swear at the defendant. In the face of these repeated threats, the defendant began to back away from the victim. The victim continued to threaten the defendant, and he tapped the defendant's nose a few times for emphasis. The defendant also noticed that the victim's right hand was in his pocket, as if he were grasping something. According to the defendant, he tried to close the apartment door on the victim, but the victim stuck his foot in the door. The defendant "ran" back into the apartment, and the victim approached him. Upon reaching the kitchen, the defendant grabbed a knife from the counter. At this juncture, his mother appeared from her bedroom and attempted to intervene; the victim lunged at the defendant, who stepped past his mother, and then "swung the knife" at the victim. The defendant testified that he had no recollection of how many times he stabbed the victim or the precise sequence of events thereafter, but eventually the victim left the apartment and went downstairs. The defendant followed him out and saw him fall. He denied having kicked the victim, and shortly after the struggle he noticed that his own finger was badly cut.

Although the two versions of the confrontation and the stabbing differ greatly up to this point, there is little dispute about what happened next. The police arrived soon after, and found the victim lying on the sidewalk outside the apartment building. A search revealed no weapons on the victim's person or in the immediate area. After speaking with Harvey and persons in a crowd that had gathered, the police approached the defendant, who was standing at the periphery of the group. Upon being informed of his rights, the defendant confessed to the stabbing, and directed the police to his apartment for retrieval of the knife. An officer went upstairs, noticing along the way bloodstains in the stairwell which extended into the defendant's apartment. After the knife was found, the defendant was taken to the police station and then to the hospital for treatment of the cut on his hand. No tests were done to determine whether the blood found in the defendant's apartment was his or that of the victim. The autopsy of the victim revealed that he had

died of five stab wounds, of which two had been inflicted to his back, two to his forehead, and one to his chest.

The defendant's arguments center on the instructions given by the trial judge to the jury. The defendant avers that the instructions regarding self-defense and provocation implicitly shifted the burden of proof from the prosecution to him, and thus were constitutionally defective under the due process standards set out in *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975), and *Sandstrom* v. *Montana*, 442 U.S. 510 (1979). These objections to the charge were not raised at trial. We therefore consider them in accordance with our duty under G. L. c. 278, § 33E. *Commonwealth* v. *Palmer*, 386 Mass. 35, 36-37 (1982). *Commonwealth* v. *Callahan*, 380 Mass. 821, 822 (1980).

It is clear that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In *Mullaney, supra* at 697-698, this principle was applied not only to facts which could exculpate a defendant but also to those which could lessen the degree of criminal liability. Consistent with this holding, we have emphasized in the past that the Commonwealth must bear the burden of proof that a defendant did not act in self-defense. *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 691-692 (1976). Cf. *Commonwealth* v. *Stokes*, 374 Mass. 583, 593 (1978) (burden of proof on excessive force); *Commonwealth* v. *Fluker*, 377 Mass. 123, 130 (1979) (provocation).

However, our unqualified adoption of the holding in *Mullaney* does not imply that we meant to require jury instructions to conform to any one set of specific guidelines in order to pass constitutional muster. "If *Mullaney* imposed such a requirement, reversal would follow with mathematical certainty in all cases where self-defense or reasonable provocation had been raised in the evidence sufficiently and where the burden of proof as to these precise issues had not been placed by specific language on the Commonwealth." *Commonwealth* v. *Stokes, supra* at 590. See also *Lannon* v. *Commonwealth*, 379 Mass. 786, 791 (1980). In accordance with the long-accepted

practice regarding jury instructions, "legal sufficiency of the instructions to the jury is to be judged on the basis of the charge as a whole, and not on the basis of limited or isolated portions of it." *Commonwealth* v. *Redmond,* 357 Mass. 333, 342 (1970). *Commonwealth* v. *Leaster,* 362 Mass. 407, 416-417 (1972).

The judge's instructions in the instant case made it clear that the Commonwealth had the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. The judge began by defining "reasonable doubt" by specifically citing and quoting *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850), stating that such doubt is "not mere possible doubt . . . . It is that state of the case, which . . . leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." Then, after explaining the various elements of murder and manslaughter, the judge expressly repeated three times that the Commonwealth bears the burden of proof in showing that the defendant did not act in self-defense.[1]

The defendant makes two general arguments. First, he objects to the "logical sequence" employed by the judge in his instructions. Second, he contends that after the judge gave his general instruction that all elements of the crime were to be proved by the Commonwealth, he did not mention self-defense until after he had reviewed various definitions of the degrees of murder and manslaughter. The defendant alleges that the instruction on self-defense came "too late," and that the jury should have been instructed after the explanation of each crime that the absence of self-defense was a necessary element.

Neither contention is correct. It is a general rule that "whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." *Sandstrom* v. *Montana, supra* at 514. There is

---

[1] On the last occasion, the judge's language could not have been more explicit: "Now, the Commonwealth — and I want to underline it — the Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense or that the defendant did not act upon a reasonable provocation."

no reason to believe that a juror would be misled by inclusion of the self-defense charge toward the end rather than the beginning of the judge's instructions, as long as the charge is accorded appropriate emphasis when it is given. It seems arguable at least that a charge given toward the end of the instructions would carry greater weight, since it would be more fresh in jurors' minds when they begin deliberations.

Further, "the law does not require repetition of the same thought at each turn." *Commonwealth* v. *Peters*, 372 Mass. 319, 324 (1977). See also *Commonwealth* v. *Redmond*, 357 Mass. 333, 342 (1970). The judge was under no obligation to repeat his charge on self-defense throughout his instructions. On this aspect the charge closely tracked the language we suggested in *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 692 n.10 (1976). The defendant raises the same general arguments regarding the provocation charge: the place in the instructions where provocation was referred to and the need for repetition. Similarly, we find no merit in these contentions.

We are also not persuaded by the defendant's claim that the occasional use of "finding" or "feeling" language by the judge effected a shift in the burden of proof. Although the use of such terms should be avoided, *Connolly* v. *Commonwealth*, 377 Mass. 527, 533-534 (1979), their use does not automatically render a set of instructions constitutionally defective. *Commonwealth* v. *Simmons*, 383 Mass. 40, 44 (1981). *Commonwealth* v. *Carballo*, 381 Mass. 227, 230 (1980). When the judge's charge is examined as a whole in the case before us, it appears that such expressions were used only when the judge was delineating the elements of a particular offense that it was up to the Commonwealth to establish, and that they were immediately preceded or succeeded by a recitation that the burden of proof was on the Commonwealth. In this context, the use of those expressions would be, at most, harmless error. See *Commonwealth* v. *Medina*, 380 Mass. 565, 578-579 (1980).

The defendant argues next that the judge's instructions intruded upon the jury's fact-finding function by suggesting that they could infer malice from the defendant's intentional use of

a deadly weapon. The structure of this argument contains the rationale for its rejection. Unlike cases where a judge charges either that a *presumption* of malice derives from the intentional use of a deadly weapon or that a person must be presumed to intend the consequences of his acts, see, e.g., *Commonwealth* v. *Stillwell*, 387 Mass. 730, 732-733 (1982), here the judge merely instructed the jury on the reasonable inferences that *could* be drawn from the use of a deadly weapon. At the beginning of his charge, the judge appropriately emphasized the permissive nature of such an inference.[2] Later in the charge, he provided a definition of "malice aforethought" that was almost a direct quotation from the common law standard. *Commonwealth* v. *Madeiros*, 255 Mass. 304, 309 (1926). Finally, after instructing that malice was not necessarily the result of ill will or hatred but rather derived from a lack of justification or excuse, the judge carefully described the logical conclusions that could be drawn from the defendant's use of a weapon, at no time implying that such conclusions were inescapable or required by law.[3]

This is not a case where it could be argued that the instructions indicated to the jury that the use of a weapon made the specific finding of malice aforethought unnecessary. See *Commonwealth* v. *Stillwell, supra* at 733.[4] Certainly, the jury were

---

[2] The judge defined "reasonable inferences" as "merely logical deductions that you may properly draw from facts that you find to be true. Always remember that when you are dealing with inferences you never have to infer anything. You may, if you want to. But you do not have to draw any inferences whatsoever." The judge followed this definition with an illustration which the defendant criticized at oral argument due to the nature of the inference required (i.e., that when mail is in your mailbox, you can infer that the mailman has come), in that it was more akin to a presumption than an inference. Although that may be true with regard to the specific example given, the judge's discussion of inferences on the whole adequately conveyed their permissive character.

[3] "If a man intentionally, without any legal justification, excuse or extenuation, uses upon the body of another a force, such as a gun, a knife, a club or whatever, or any other instrument, a force such that as used would probably do grievous bodily harm to that other and would create a plain and strong likelihood that the other would die as a result, you the jury *may infer* that that act was done maliciously within the meaning of the law . . ." (emphasis added).

[4] In that decision we held that "[h]ad the language of the charge merely permitted the jury to infer the fact of malice, rather than requiring them to

*entitled* to infer malice from the intentional use of a deadly weapon, so long as the judge's instructions did not compel them to do so. *Lannon* v. *Commonwealth*, 379 Mass. 786, 793 (1980). *Commonwealth* v. *Kendrick*, 351 Mass. 203, 209-210 (1966). *Commonwealth* v. *York*, 9 Met. 93, 103 (1845). We find no error in the judge's instructions on malice aforethought.

The defendant also attacks the substance of the charge on self-defense. His first criticism is that it was error for the judge to employ an "objective" standard in his self-defense instructions with respect to the defendant's apprehension of danger and his reaction to the threat. The judge's charge was correct; its language closely tracked the self-defense standard we enunciated in *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980).[5] As we noted in a related context regarding the distinction between murder and manslaughter, "[s]ince malice does not require any actual or subjective intent to kill or to inflict grievous bodily harm, there is no basis in our law for the defendant's suggestion that provocation should be viewed subjectively." *Commonwealth* v. *Amaral*, 389 Mass. 184, 190 (1983). See also *Commonwealth* v. *Starling*, 382 Mass. 423, 428 (1981). The same holds true for the self-defense test, which requires that the defendant "had *reasonable* ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm" and that he "used no more force than was *reasonably* necessary in all the circumstances of the case." *Harrington, supra* at 450 (emphasis added).

The defendant additionally contends that the judge employed an incorrect definition of "dwelling" in explaining the applica-

---

presume it solely from the fact of the shooting, no new trial would be necessary." *Stillwell, supra.*

[5] The judge's instructions on the defendant's self-defense right stated in relevant part: "If the assailant is threatening him [the defendant] or doing some act endangering his personal safety, and if he reasonably thought that his personal safety or life was in peril, he is to be judged by the situation in which he is placed. And if he acted as a person of ordinary prudence and firmness of mind, even though he may have misjudged the situation, and if he reasonably believed that his life or person was in danger, then the law says he may protect himself by adequate and appropriate means."

bility of G. L. c. 278, § 8A.[6] The judge instructed the jury in accordance with that statute. The judge defined "dwelling" as a place where one is "temporarily or permanently residing and which is in [one's] exclusive possession." With reference to an apartment building, the judge stated that "a tenant's dwelling cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control."

This definition accords with our interpretation of the term "dwelling" in analogous contexts. *Commonwealth* v. *Seay*, 376 Mass. 735, 742 (1978) (right to carry firearm without license while within one's dwelling). *Commonwealth* v. *Thomas*, 358 Mass. 771, 774-775 (1971) (search of cellar did not invade area within the "curtilage" of defendant's apartment). As we observed in *Seay*, "[t]he interest of an apartment dweller in defending himself — the only apparent reason for allowing him to carry a firearm in his own dwelling in the first place — is clearly attenuated when he passes his doorway to enter a common area offering easy retreat." *Seay, supra* at 742-743. There was no error in the judge's instructions in this regard.

Finally, the defendant asks us to exercise our discretion under § 33E, after a review of the record as a whole, to reduce the jury's verdict to a lesser degree of guilt or to grant a new trial. The jury, apparently, did not believe the defendant's version of how he killed the victim in self-defense. His testimony varied considerably from that of Harvey. Harvey stated at trial that the victim had turned away from the defendant's mother and was walking downstairs when the defendant came

---

[6] General Laws c. 278, § 8A, inserted by St. 1981, c. 696, provides that: "In the prosecution of a person who is an occupant of a dwelling charged with killing or injuring one who was unlawfully in said dwelling, it shall be a defense that the occupant was in his dwelling at the time of the offense and that he acted in the reasonable belief that the person unlawfully in said dwelling was about to inflict great bodily injury or death upon said occupant or upon another person lawfully in said dwelling, and that said occupant used reasonable means to defend himself or such other person lawfully in said dwelling. There shall be no duty on said occupant to retreat from such person unlawfully in said dwelling."

out of his apartment and stabbed the victim from behind. The victim was not carrying a weapon. Harvey also failed to corroborate the defendant's account of the victim's repeated threats to kill him, or of the victim's entering the defendant's apartment, except to agree that the victim stuck his foot in the defendant's door at an earlier stage of the confrontation. The jury were entitled to find that the stabbing occurred outside the defendant's "dwelling."

Nor was the jury's failure to reduce the crime from murder to manslaughter unreasonable. On the record, there was no evidence of a "reasonable provocation." Words alone, perhaps accompanied by the victim's tapping the defendant on the nose, do not appear to suffice. Further, if Harvey's account was believed, there was time for a "cooling off" before the defendant's decision to stab the victim.

On conflicting evidence, the jury adopted a version of the events that amply supports its verdict of murder in the first degree. The jury were entitled to infer malice from the intentional use of a deadly weapon. The "cooling off" period may also have provided an opportunity for the defendant deliberately and with premeditation to contemplate stabbing the victim. These factual issues were within the peculiar province of the jury, and we find no miscarriage of justice in the result of their deliberations.

*Judgment affirmed.*