COMMONWEALTH vs. BENJAMIN GOLDOFF.

Suffolk.    February 13, 1987. — July 15, 1987.

Present: PERRETTA, KAPLAN, & WARNER, JJ.

*Burglary. Statute,* Construction. *Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Evidence,* Flight, Consciousness of guilt. *Words,* "Dwelling house."

At the trial of an indictment brought under G. L. c. 266, § 14, charging the defendant with breaking and entering a "dwelling house" in the night time with intent to commit a felony and assaulting a person lawfully therein, evidence that the victim had entered his five-story, ten-unit apartment building on the way to his fourth-floor apartment by using his key to unlock an inner door that led into the common hallway of the first floor where the assault took place was sufficient to show that the victim, when assaulted, was within his "dwelling house" within the meaning of c. 266, § 14. [459-464]

Where at the trial of an indictment charging the defendant with breaking and entering a "dwelling house" in the night time with intent to commit a felony and assaulting a person lawfully therein it was undisputed that the assault took place in a locked common hallway of the victim's apartment building, the judge correctly instructed the jury that the assault, if any, occurred at a place which was part of the victim's "dwelling house." [464-465]

At the trial of an indictment, the judge did not err in allowing the defendant to be questioned about his failure to appear in court on previous dates, leaving it for the jury to determine whether his departure from the Commonwealth with knowledge of the pendency of the proceedings against him was indicative of a consciousness of guilt, where it was undisputed that the defendant had previously been informed when he would be notified as to the date on which he next would be required to appear and yet left the Commonwealth without first notifying anyone of his intended absence. [465-466]

At a criminal trial, the prosecutor's alleged excessiveness in his closing argument did not, in the circumstances, create a substantial risk of a miscarriage of justice. [466]

INDICTMENT found and returned in the Superior Court Department on December 10, 1982.

The case was tried before *Robert J. Donelan,* J., sitting under statutory authority.

*Michael R. Schneider,* Committee for Public Counsel Services (*Joel A. Goodman,* Committee for Public Counsel Services, with him) for the defendant.

*Joseph Kittredge,* Legal Assistant to the District Attorney (*David B. Mark,* Assistant District Attorney, with him) for the Commonwealth.

PERRETTA, J. Returning to his apartment on the night of October 13, 1982, the victim entered the five-storied, ten-unit apartment building through the unlocked main door. He checked his mailbox and then unlocked the inner door that led into the common hallway of the first floor and to the staircase to his fourth-floor apartment. As he passed through the inner door and into the hallway, the victim saw the defendant coming down the stairs. He was carrying two paintings which the victim recognized to be his property. Words were exchanged, the defendant grabbed the victim by the collar of his coat, "slammed" him against the wall, and warned that he had a gun which he was prepared to use. On appeal from his conviction on an indictment brought under G. L. c. 266, § 14, the defendant makes four arguments: (1) because the assault took place in a common hallway and not the victim's apartment, as matter of law the victim was not assaulted within his "dwelling house"; (2) apparently in the alternative, whether the assault took place within the victim's "dwelling house" was a question of fact which the trial judge erroneously took from the jury in his instructions to them; (3) it was error to allow the jury to consider whether the defendant's trip to Florida and his subsequent default while these proceedings were pending were indicative of consciousness of guilt; and (4) because of "prejudicial excesses" in the prosecutor's closing argument, there is a substantial risk that a miscarriage of justice has occurred. We affirm.

I. *A Dwelling House.*

There was evidence to show that there are two apartment units on each of the five floors of the building in question. A

fire escape connects to one of the bedroom windows of the victim's fourth-floor apartment. The door to the victim's unit leading to the fourth-floor common hallway is secured from within by what was described as a "police lock."

On the evidence presented, the jury could have found that the defendant gained access to the victim's apartment unit by climbing the fire escape and breaking and entering through the bedroom window. Once within the apartment unit, the defendant took the two paintings and left by the door to the unit, going into the common hallway and down the stairs. He met and assaulted the victim in the hallway on the first floor and then fled from the building via the inner and main doors.

General Laws c. 266, § 14, provides in relevant part: "Whoever breaks and enters a dwelling house in the night time, with intent to commit a felony . . . making an actual assault on a person lawfully therein, shall be punished. . . ." The defendant's argument is straightforward. As the assault occurred within the common hallway and not within the victim's apartment unit, as matter of law the victim was not within his "dwelling house" when assaulted.

Section 14 does not define the term "dwelling house." As applied to a multi-family residential structure, such as an apartment building, the defendant would have us construe the term restrictively to mean the dweller's apartment unit and areas under his exclusive control. As support for his definition, he cites *Commonwealth* v. *Thomas,* 358 Mass. 771, 775 (1971); *Commonwealth* v. *Dinnall,* 366 Mass. 165, 167 (1974); *Commonwealth* v. *Seay,* 376 Mass. 735, 742-743 (1978); and *Commonwealth* v. *Albert,* 391 Mass. 853, 861-862 (1984).

"When a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose. See *Commonwealth* v. *Gove,* 366 Mass. 351, 354 (1974); *Franki Foundation Co.* v. *State Tax Comm'n,* 361 Mass. 614, 617 (1972). We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." *Commonwealth* v. *Zone Book, Inc.,* 372 Mass. 366, 369 (1977), cited in *Common-*

*wealth* v. *Correia,* 17 Mass. App. Ct. 233, 235 (1983), where it was determined that for purposes of G. L. c. 266, § 14, a motel is a "dwelling house." In the cases cited by the defendant, the boundaries of a person's dwelling within an apartment building were set consistently with the legislative purposes there at issue.

Both *Thomas* and *Dinnall, supra,* concern the reasonableness of a tenant's expectation of privacy in areas of a multi-unit building which the tenant shared with others and to which others had access. It is consistent with constitutional guarantees to limit the reasonableness of a person's expectation of privacy to those areas to which others do not have access, without permission, to see or hear something expected to be secret or confidential. This principle applies uniformly to residents of single and multi-family structures. " 'What a person knowingly exposes to the public, *even in his own home* or office, is not a subject of Fourth Amendment protection'" (emphasis supplied). *Dinnall,* 366 Mass. at 167 quoting from *Katz* v. *United States,* 389 U.S. 347, 351 (1967). *Thomas* involved a cellar available for use by all the tenants, 358 Mass. at 774, and *Dinnall* spoke of a hallway "which could be freely entered by anyone." 366 Mass. at 167.

In *Seay,* 376 Mass. at 742-743, and *Albert,* 391 Mass. 861-863, the court was concerned with the limited extent to which conduct not otherwise allowed is permitted by statutes for purposes of self-defense. Thus it has been determined that a tenant may carry a firearm without a license and may stand his ground rather than retreat in the face of force and be exempt from criminal liability so long as, in each instance, the tenant confines such conduct to the apartment unit. The restricted definition of "dwelling house" as applied to apartments given by these cases is consistent with the limited purpose, self-defense, of the express and implied statutory exemptions. See, respectively, G. L. c. 278, § 8A, the so-called "castle law," and G. L. c. 269, § 10(*a*), as read with handgun licensing statutes in *Seay, supra.*

As to all the cases relied upon by the defendant (*Thomas, Dinnall, Seay,* and *Albert, supra*), it can be said of each that

the defendant-tenant's claim depended upon a right of exclusive use of those areas to which, it was contrarily found, there was free and open access and all the tenants had a right to come and go.

It is the purpose of burglary statutes, however, to prohibit that conduct which violates a person's right of security in a place universally associated with refuge and safety, the dwelling house. Cf. *People* v. *Tomlins,* 213 N.Y. 240, 243 (1914) ("Flight is for sanctuary, and shelter, and shelter, if not sanctuary, is in the home"). To further rather than frustrate the purpose of these statutes, the term "dwelling house" as used in the context of burglary always has been construed broadly. "By the common law, every house for the dwelling and habitation of man is taken to be a mansion house, wherein burglary may be committed . . . . Any outhouses, within the curtilage or some common fence as the mansion itself, must be considered as parcel of the mansion . . . . [I]f the outhouses be adjoining the dwelling house, and occupied as parcel thereof, though there be no common enclosure or curtilage, they may still be considered as parts of the mansion." *Devoe* v. *Commonwealth,* 3 Met. 316, 325-326 (1841). The "historical background of the burglary statutes, the traditional meaning given to 'dwelling' and 'dwelling house' by legal dictionaries and treatises," *Commonwealth* v. *Correia,* 17 Mass. App. Ct. at 236, show that the term may comprehend areas within a person's place of habitation but which are beyond his exclusive control.

When this historical right to security in one's place of habitation is considered in the context of contemporary multi-unit residential structures, we can think of no reason why that right should not apply to tenants who reach their apartment units by a common hallway which they have collectively secured from the general public by a locked door. See *People* v. *Nunley,* 203 Cal. Rptr. 153, 162 (Cal. Ct. App. 1984) ("The legislative determination to treat residential burglaries more severely than others [see and compare G. L. c. 266, §§ 14 & 15, with §§ 16, 16A & 17] is predicated upon the 'statistically greater probability' that an occupant will be present and confronted by the

intruder. . . . The courts, in following the legislative intent, have found, for example, that felonious entry into an open carport is burglary of a dwelling house, . . . as is such entry into an attached garage or enclosed patio. . . . This reasoning applies with equal or greater force when the common areas of an apartment building (or condominium complex) are concerned. These areas are not open to the public; they comprise a portion of each occupant's dwelling house. The criminal who unlawfully enters there violates the habitation of each of them, and each is endangered by the possibility of confronting him or her" [citations omitted]). See also Model Penal Code § 221.1(1) (Proposed Official Draft 1962) ("A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with purpose to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter") and comment to § 221.1(1) ("It is the individual unit as well as the overall structure that must be safeguarded"). Cf. *People* v. *McCurdy,* 86 A.D.2d 493, 497-498 (N.Y. 1982) ("[T]he hallway outside of defendant's apartment was part of his dwelling under the particular facts of this case . . . . [T]he hallway was located in a brownstone. Access to the hallway was limited to residents of the building and their guests. A locked front door insured this security. The incident itself took place at the foot of the stairs leading to the apartment").

We conclude that, for purposes of G. L. c. 266, § 14, an apartment dweller's "dwelling house" does include secured common hallways. However, as the physical features of a multi-family residential structure will vary from case to case, so too will the determination whether the common areas of that structure, even if locked, constitute the tenant's "dwelling house."

In the instant case, the only evidence concerning the physical features of the building is the victim's undisputed testimony that, as earlier described, it is five-storied with two apartment units on each floor. To enter the building from the street, one must pass through the unlocked main door. Access beyond that point is controlled by a locked inner door which opens into the first-floor common hallway leading to the two first-

floor apartments and the stairs to the upper levels. On the night of the assault, the victim used his key to open the inner door. It follows from what we have said that the evidence presented was sufficient to show that the victim, when assaulted, was within his "dwelling house."

II. *The Jury Instruction.*

In some instances, whether access to a common hallway is sufficiently controlled so as to secure it from entry by those neither licensed nor authorized to enter may, in light of all the circumstances revealed by the evidence, present a question to be passed to the jury with appropriate instructions. Here the trial judge instructed: "[I]f the Commonwealth proves beyond a reasonable doubt that . . . [the defendant] assaulted . . . [the victim] in the downstairs hall at a point beyond and inside the locked front door on the ground floor of the building, then the incident happened, for purposes of this statute, in the dwelling house." The defendant claims that the instruction constitutes reversible error because it took a question of fact from the jury.

It was undisputed at trial that the assault took place in that part of the first-floor hallway to which the victim gained access by using his key to open the front door. Whether the common hallway could be freely entered notwithstanding that locked inner door was never an issue at trial.[1] Cf. *Commonwealth* v. *Puleio,* 394 Mass. 101, 109 (1985); *Commonwealth* v. *Gabbidon,* 398 Mass. 1, 5 (1986); *Commonwealth* v. *Fulgham,* 23 Mass. App. Ct. 422, 427 (1987). Both the Commonwealth and the defendant proceeded throughout the trial on the basis that the assault took place in the locked common hallway. The only question then (aside from whether the defendant was the assailant) was whether the locked common hallway was a part of the victim's "dwelling house." Applying the law to the facts which the parties accepted and upon which they tried the case, the trial judge correctly instructed the jury that the assault, if

---

[1] Although the defendant notes in passing in his brief before us that the fact that the victim had a "police lock" cn the door to his apartment unit demonstrated that he did not regard the common hallway as secured, the issue was not raised at trial.

any, occurred at a place which was part of the victim's "dwelling house."

III. *Consciousness of Guilt.*

After the defendant's probable cause hearing in November, 1982, the matter was bound over to a grand jury and an indictment returned. The defendant did not thereafter appear in court, and a default warrant issued in January, 1983. The defendant was arrested on that warrant in September, 1983.

At the close of its case, the Commonwealth sought to put in evidence the docket sheets of the Superior Court proceedings which indicate that the defendant had been in default from January through September, 1983. The Commonwealth maintained that the defendant's failure to appear in court as required was evidence of the defendant's consciousness of guilt.

Objecting, the defendant argued that he never received a notice of any scheduled court appearances and that he went to Florida for employment reasons, voluntarily returning to Boston in April or May, 1983. The Commonwealth responded with the allegation that the defendant did not receive certain notices of his required appearances because they had been delivered to a nonexistent address which the defendant had furnished to the police at the time of his arrest.

Because he concluded that there was insufficient evidence to show that the defendant had given the police a false address, the trial judge refused to allow the Commonwealth to press or cross-examine the defendant on the address issue. However, he did allow the defendant to be questioned about his failure to appear in court, leaving it for the jury to determine whether his departure from the Commonwealth with knowledge of the pendency of the proceedings against him was indicative of a consciousness of guilt.[2]

In explaining his failure to appear in court in January, 1983, the defendant testified as follows. When in court for his probable cause hearing in November, 1982, the defendant was in-

---

[2] The trial judge also allowed defense counsel's request that, if the fact of the defendant's default was to be admitted in evidence, all the docket entries showing the defendant's numerous appearances should also be put before the jury.

formed that he would be notified in December of the date on which he would next be required to appear. The defendant left for Florida just after Christmas because he had not received notice and "assumed" that the Commonwealth "didn't know what they were going to do." His absence in January, 1983, was not due to a desire to "avoid" the proceedings; rather, he went to Florida to work on a fishing boat, returning to Boston in April or May.

These facts show more than the defendant's unexplained failure to appear in court. Compare *Commonwealth* v. *Hightower,* 400 Mass. 267, 269 (1987), where the Commonwealth failed to "produce evidence that the defendant knew the scheduled trial date and nevertheless failed to appear." Here the Commonwealth asserted, and the defendant did not dispute, that the defendant had been informed that he would be notified in December as to the date on which he next would be required to appear. In *Hightower, supra,* the defendant testified that he appeared in court on what he believed to be the correct date as well as " 'a couple of times that [same] week.' "

We see no error in the trial judge's ruling that it was for the jury to determine whether the defendant's action in leaving Massachusetts when he did (and without first notifying anyone of his intended absence, cf. *Commonwealth* v. *Francis,* 374 Mass. 750, 753-754 [1978]) was flight motivated by a consciousness of guilt. See *Commonwealth* v. *Toney,* 385 Mass. 575, 585 (1982); *Commonwealth* v. *Patch,* 11 Mass. App. Ct. 981 (1981).

IV. *The Prosecutor's Closing Argument.*

Even accepting the defendant's claim that, in three statements in his closing argument, the prosecutor passed from extravagance to impermissible excessiveness, our review of the evidence, the prosecutor's closing argument in its entirety, and the trial judge's instructions to the jury leads us to conclude that there is no substantial risk that a miscarriage of justice occurred. See *Commonwealth* v. *Palmariello,* 392 Mass. 126, 134-135 (1984); *Commonwealth* v. *Kozec,* 399 Mass. 514, 517-518 (1987); *Commonwealth* v. *Lowe,* 15 Mass. App. Ct. 262, 266 (1983).

*Judgment affirmed.*