## Commonwealth *vs*. Stephen J. Gruning.

No. 97-P-1304.

Essex. February 10, 1999. - May 26, 1999.

Present: Warner, C.J., Smith, & Spina, JJ.

*Practice, Criminal,* Argument by prosecutor, Presumptions and burden of proof, Instructions to jury, Capital case, Psychiatric examination. *Constitutional Law,* Self-incrimination. *Felony-Murder Rule. Homicide. Malice.*

At a criminal trial, the prosecutor's rhetorical question, "Why?," made in the context of his remarks on motive in his opening statement, was not improper and did not shift the Commonwealth's burden of proof. [844-846]

The felony of entering a dwelling while armed and using force therein is inherently dangerous such as to support the application of the felony-murder rule in a murder case. [846-847]

In a murder case, the underlying felony of home invasion was, in the circumstances, sufficiently independent from the homicide to support a felony-murder conviction, where there were additional and separate felonious assaults on two other persons in the dwelling as well as on the murder victim. [847-848]

In a murder case, there was no basis for a voluntary manslaughter instruction, where the victim had not provided any reasonable provocation for the defendant to have acted in the heat of passion. [848-849]

This court declined to adopt a view, contrary to Massachusetts case law, that there is a constitutional right to counsel when a criminal defendant is examined by a psychiatrist pursuant to Mass.R.Crim.P. 14(b)(2)(B). [849]

Indictments found and returned in the Superior Court Department on February 22, 1995.

The cases were tried before *Richard E. Welch, III*, J.

*Robert L. Sheketoff* for the defendant.

*Elin H. Graydon*, Assistant District Attorney (*Robert N. Weiner*, Assistant District Attorney, with her) for the Commonwealth.

Warner, C.J. A Superior Court jury found the defendant guilty of manslaughter in the death of Nelson DeOliveira, second

degree felony-murder of Richard Stuart, armed assault with intent to kill as to Rhonda Stuart, assault and battery by means of a dangerous weapon, entering a dwelling while armed and using force therein, and illegal possession of a firearm.

On appeal, the defendant claims (1) the prosecutor's opening statement was improper; (2) there was no independent felony to support the felony-murder conviction; (3) the judge should have given an alternative manslaughter instruction with respect to Richard Stuart; and (4) the court should have provided him with exclusive access to the audiotape from his psychiatric interview.

The jury could have found the following facts beyond a reasonable doubt. Rhonda Stuart and the defendant began a dating relationship in August of 1993. Throughout the next year and one-half, their relationship could be described as volatile, at best. There were several instances when the defendant became verbally and physically abusive toward Rhonda.

At one point in late 1994, the defendant stated to a friend of Rhonda's that he had gone to Rhonda's house with a knife to kill her, but that ultimately he could not follow through with his plan. In December of 1994, the couple, after doing so several times previously, once again decided to terminate their romantic relationship. Nonetheless the two remained in contact.

On February 12, 1995, after being out with a friend, Rhonda paged the defendant on his beeper at 1:49 A.M. to tell him that she was going home. She testified that she did this because she thought that if she did not the defendant would telephone her all night long. Rhonda then paged Nelson DeOliveira, a man whom she had been dating for approximately one month, at 2:18 A.M. The two subsequently met and at approximately 3:30 A.M. drove to Rhonda's Lynn apartment, which she shared with her brother, Richard Stuart. The defendant was waiting outside the apartment, and began to argue with Rhonda in the street. She gave her keys to DeOliveira and asked him to go inside her apartment and call the police. Rhonda and the defendant continued to argue, with the defendant pushing and striking her.

As the police arrived, DeOliveira and Richard were just leaving the apartment. The police separated Rhonda and the defendant, who were still arguing. The defendant told the police that he had come over to the apartment because Rhonda had called him and told him she loved him and that he should meet her, but she never showed up at their meeting place. While the police were there, the defendant repeatedly yelled to Rhonda

that he just wanted to speak with her. She told the defendant to go home and that she would call him in the morning. Rhonda then went inside her apartment with DeOliveira and her brother, and proceeded into her bedroom with DeOliveira.

While waiting with the police for a taxi, the defendant explained that he became angry when he saw Rhonda arrive at her apartment with another man. During the ride home to Somerville, the defendant told the taxi driver that his girlfriend had cheated on him, and stated that his blood pressure was boiling and that he would "kill the bitch." He also stated that he would "like to pop him, and if she is there, then she will be going down with him." Giving the taxi driver a large tip, the defendant said he would not be around to spend any more money.

At approximately 6:30 A.M., Rhonda's neighbors called the police after hearing gunshots. When the police arrived, they noticed that the apartment door had been broken open, and they detected a strong odor of gun powder. Richard's body was lying between the bedroom and the hallway. He had died from a gunshot wound in the chest. The police proceeded down a hallway leading to a rear bedroom. A sledgehammer was lying on the hallway floor and the bedroom door had been broken. The police discovered DeOliveira's body lying on the floor in the doorway of the bedroom. He had been fatally shot in the chest and head. Rhonda was found lying in her bed. She had been shot in the chest and was breathing, though unresponsive. She was later taken to a hospital and had one of her lungs surgically removed.

At approximately seven that morning, the defendant went to the home of his former girlfriend. There, he told his former girlfriend's mother that he had killed someone. She subsequently called her daughter, who was at work at the time. The defendant explained to his former girlfriend that he had lost control because, when he called Rhonda after the police had sent him home, she had not hung the phone up properly, and he could hear her having sexual relations with DeOliveira. He also stated that he then retrieved his uncle's gun, drove to Rhonda's apartment, broke down the apartment door with a sledgehammer, shot Richard, fought with and shot DeOliveira, and shot at Rhonda.

1. *Opening statements.* During opening statements, the prosecutor detailed the defendant's actions in shooting the victims and then, gesturing toward the defendant, asked "Why?

Why?'' Defense counsel immediately objected and was subsequently overruled, with the judge indicating that the prosecutor was entitled to discuss motive. The prosecutor then continued, asserting that the motive behind the defendant's conduct was jealousy. At the conclusion of the prosecutor's opening statement, defense counsel moved for a mistrial or an immediate curative instruction, but the judge denied the request.[1]

The defendant asserts that the prosecutor made an improper comment on his right to remain silent and that, as a result, the judge should have declared a mistrial, or at a minimum, given immediate curative instructions. The defendant also argues that when the judge overruled the defendant's objection, he exacerbated the prosecutor's error by implying that the remarks were proper. See *Commonwealth* v. *Young*, 399 Mass. 527, 531 (1987).

It is true that a prosecutor may not comment upon a defendant's right to remain silent as provided by the Fifth Amendment to the Federal Constitution. See *Commonwealth* v. *Crichlow*, 30 Mass. App. Ct. 901, 902 (1991). It is, however, permissible for a prosecutor to ''ask the jury rhetorical questions that touch on the defendant's constitutional right not to incriminate himself without violating that right provided the questions are not 'of such a nature that a jury would naturally and necessarily construe them to be directed to the failure of the defendant to testify.' '' *Commonwealth* v. *Grant*, 418 Mass. 76, 83 (1994), quoting from *Commonwealth* v. *Smallwood*, 379 Mass. 878, 892 (1980). Compare *Commonwealth* v. *Habarek*, 402 Mass. 105, 111 (1988) (rhetorical question not proper if jury could have perceived it as having shifted Commonwealth's burden of proof to defendant).

Here, the prosecutor's one comment as to why the defendant acted as he did was a rhetorical question. See *id.* at 110-111. In

---

[1]The exchange went as follows:

DEFENSE COUNSEL: ''[T]his is my second grounds for a mistrial, to stand in front of the defendant and look him in the face and say 'Why?,' which was exactly what was done. It is a comment on his rights to remain silent. It is a challenge for him to give an explanation in the courtroom. I move for a mistrial on that, or at least for an immediate curative instruction on it immediately, your Honor.''

JUDGE: ''I don't believe it comes close to a comment upon his right to remain silent. When you objected, it was plain to me that [the prosecutor] was going to the issue of motive. He is entitled to go into motive I said. That's plainly what the context was.''

the context of the entire opening statement, it is clear (as the trial judge noted in overruling the objection) that the prosecutor's question addressed the defendant's motive, given that the prosecutor immediately discussed this issue after defense counsel's objection. See *Commonwealth* v. *Snow*, 34 Mass. App. Ct. 27, 34 (1993) (during opening statements prosecutor free to articulate underlying motive expected to be proved). The remark could not be construed as a comment on the defendant's right of silence, or as a burden shifting comment. See *Commonwealth* v. *Rogers*, 43 Mass. App. Ct. 782, 786 (1997) (prosecutor's rhetorical question did not shift burden of proof in light of context in which questions were asked). The prosecutor's comment was proper.

Moreover, directly prior to opening statements, the judge twice instructed the jury that it was the Commonwealth only that had the burden of proof. The judge's final instructions reiterated this point. Hence, the jury would have understood that the Commonwealth had the burden of proof and that the defendant had the right to remain silent. See *Commonwealth* v. *Habarek*, 402 Mass. at 111.

2. *Felony-murder*. The defendant argues that the underlying felony of entering a dwelling while armed and using force therein, G. L. c. 265, § 18C,[2] was not an inherently dangerous felony sufficient to support his felony-murder conviction as to Richard. The defendant further contends that the felonious assault on Richard merged with the homicide, thereby bootstrapping the underlying felony to the murder. See *Commonwealth* v. *Quigley*, 391 Mass. 461, 465 (1984), cert. denied, 471 U.S. 1115 (1985) (there must be a felony independent from the homicide).

"In order to invoke the felony-murder rule, the Commonwealth must establish that the defendant was a participant in a felonious enterprise independent of the homicide, that the

---

[2]General Laws c. 265, § 18C, as inserted by St. 1993, c. 333, provides that "[w]hoever knowingly enters the dwelling place of another knowing or having reason to know that one or more persons are present within or knowingly enters the dwelling place of another and remains in such dwelling place knowing or having reason to know that one or more persons are present within while armed with a dangerous weapon, uses force or threatens the imminent use of force upon any person within such dwelling place whether or not injury occurs, or intentionally causes any injury to any person within such dwelling place shall be punished by imprisonment in the state prison for life or for any term of not less than twenty years."

felony was inherently dangerous . . . , that the homicide occurred in the course of the felonious enterprise, and that the death must have been the natural and probable consequence of the felony." *Commonwealth* v. *Padgett*, 44 Mass. App. Ct. 359, 364-365 (1998) (footnote and citations omitted).

With respect to the defendant's contention that the underlying felony is not inherently dangerous, the Supreme Judicial Court's recent analysis of related statutes shows that the felony of entering a dwelling while armed and using force therein is inherently dangerous and sufficient to support the felony-murder rule. See *Commonwealth* v. *Claudio*, 418 Mass. 103, 108-109 (1994) (G. L. c. 266, § 14 — breaking and entering into a dwelling in the nighttime with the intent to commit armed assault on an occupant of the dwelling — is a proper predicate felony); *Commonwealth* v. *Gunter*, 427 Mass. 259, 271 (1998) (G. L. c. 265, § 18A — armed assault in a dwelling with intent to commit a felony — is an acceptable predicate felony). See also *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58, 60 (1997) (G. L. c. 265, § 18A, and G. L. c. 266, §§ 14-19, have "related statutory contexts"). Moreover, burglaries involving entry into a residence are generally considered particularly egregious. *Commonwealth* v. *Claudio*, 418 Mass. at 109. General Laws c. 265, § 18C, is an appropriate predicate felony to support felony-murder.

The next question is whether the felony was independent from the homicide. Massachusetts has limited the felony-murder rule so that "the conduct which constitutes the felony must be 'separate from the acts of personal violence which constitute a necessary part of the homicide itself.' " *Commonwealth* v. *Quigley*, 391 Mass. at 466, quoting from LaFave & Scott, Criminal Law § 71, at 559 (1972). That is, "[i]f the acts constituting [the felonious] assault also cause the homicide," it cannot be said that the felony was independent of the homicide. *Commonwealth* v. *Gunter*, 427 Mass. at 273-274.

In the present case, the underlying felony pursuant to G. L. c. 265, § 18C, was "sufficiently independent" from the homicide to support the defendant's felony-murder conviction as to Richard. See *id.* at 271. The defendant was convicted of the felony-murder of Richard, manslaughter in the death of DeOliveira, and armed assault with intent to kill Rhonda. The jury could have found that the defendant entered the Lynn apartment, in which he knew people were present, carrying a

848     46 Mass. App. Ct. 842 (1999)

Commonwealth v. Gruning.

sledgehammer and armed with a dangerous weapon; he shot and killed Richard, whom he encountered on the way to a confrontation with DeOliveira and Rhonda. The felony here did not merge with Richard's homicide because there were two additional and separate felonious assaults resulting in the death of DeOliveira and grievous injury to Rhonda. See *id.* at 274-275 (because three independent assaults had occurred, the felony of armed assault in a dwelling with intent to commit a felony, G. L. c. 265, § 18A, was sufficiently separate from the homicide to support the felony-murder conviction). See also *Commonwealth* v. *Roberio*, 428 Mass. 278, 282 (1998) ("numerous assaults" on victim were separate acts of personal violence allowing for both felony-murder and armed robbery convictions).

Moreover, the indictment here for the predicate felony specifically provided, and the evidence supported, that not only Richard, but DeOliveira and Rhonda, were assaulted as well, thereby indicating that the felony was committed against three separate victims. Contrast *Commonwealth* v. *Gunter*, 427 Mass. at 274-275 & n.16 (Commonwealth did not present separate indictments for three assaults on three victims). Thus, a felony-murder conviction was warranted with respect to Richard, as the defendant killed him in the course of committing felonious assaults upon both DeOliveira and Rhonda.

3. *Manslaughter.* The defendant asserts that the jury should have been given an alternative manslaughter instruction regarding the death of Richard. The defendant first argues that, because he acted upon reasonable provocation, the "constructive malice" required for felony-murder (the intent to commit the underlying felony) was negated. Citing *Commonwealth* v. *McLeod*, 394 Mass. 727, cert. denied, 474 U.S. 919 (1985), the defendant next contends that provocation no longer has to come from the deceased, and therefore, he was entitled to a manslaughter instruction with respect to Richard, even though Richard did not provoke him.

To warrant a voluntary manslaughter instruction, there must be "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Robinson*, 14 Mass. App. Ct. 591, 599 (1982), quoting from *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980). There must also be a "causal connection between the provocation, the heat of passion, and the killing." *Ibid.*, quoting from *Commonwealth* v.

*Schnopps*, 383 Mass. 178, 180-181 (1981). Moreover, the "[p]rovocation must come from the deceased to warrant [a voluntary manslaughter] charge." *Ibid.*

In *Commonwealth* v. *McLeod*, 394 Mass. at 739 & n.15, a manslaughter instruction was presumed to be warranted because, even though the defendant may or may not have thought that the victim was a certain person, he nonetheless believed the victim was his adversary and acted accordingly. Consequently, the defendant's reliance on *McLeod* is misplaced because here the defendant did not act under the mistaken belief that Richard was one of his provokers. It follows that the defendant was not entitled to a manslaughter instruction with respect to Richard, as there is no evidence that Richard provided any reasonable provocation for the defendant to act in the heat of passion.

4. *Psychiatric examination.* Conceding that Massachusetts case law is to the contrary (see *Commonwealth* v. *Trapp*, 423 Mass. 356, 359, cert. denied, 519 U.S. 1045 [1996]; *Commonwealth* v. *Baldwin*, 426 Mass. 105, 113 [1997], cert. denied, 119 S. Ct. 61 [1998]), the defendant nonetheless claims that this court should adopt the dissenting view in *United States* v. *Byers*, 740 F.2d 1104, 1161-1172 (D.C. Cir. 1984) (Bazelon, J., dissenting), that there is a constitutional right to counsel at the "confrontation" between the defendant and the psychiatrist. We decline the invitation.

*Judgments affirmed.*