COMMONWEALTH *vs.* JEFFREY DOUCETTE.

Essex. November 2, 1999. - December 15, 1999.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Armed Home Invasion. Practice, Criminal,* Capital case, Instructions to jury, Duplicative convictions. *Homicide. Felony-Murder Rule. Self-Defense. Words,* "Dwelling house."

At the trial of an indictment alleging armed home invasion, the judge correctly left to the jury the question of what, in the circumstances, comprised the "dwelling house" of an apartment dweller in a two-family house. [466-467]

There was no merit to a criminal defendant's claim that the judge's correct instructions on the elements of murder in the first degree by means of deliberate premeditation, armed home invasion, and felony-murder confused the jury. [467-468]

At the trial of indictments for murder and armed home invasion, the judge correctly instructed the jury on the use of nondeadly and deadly force in self-defense, and where self-defense was not available with respect to a charge of armed home invasion, the instructions were more favorable to the defendant than he was entitled to. [468-470]

At the trial of a murder indictment, error, if any, in the judge's instructions on manslaughter were inconsequential, where the jury convicted the defendant of felony-murder. [470]

A conviction of armed home invasion that constituted the felony underlying a conviction of felony-murder was duplicative. [471]

INDICTMENTS found and returned in the Superior Court Department on November 1, 1995.

The cases were tried before *Barbara J. Rouse,* J.

*Nona E. Walker,* Committee for Public Counsel Services, for the defendant.

*Marcia H. Slingerland,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury found the defendant guilty of murder in the first degree on a theory of felony-murder (with armed home

invasion under G. L. c. 265, § 18C, as the underlying felony).[1] The defendant was also convicted by the jury of other crimes stemming from the incident.[2] Represented by new counsel on appeal, the defendant's arguments allege error in the judge's instructions to the jury on the elements of the crime of armed home invasion, on whether that crime is an inherently dangerous felony, and on the elements of self-defense and manslaughter. We reject the defendant's arguments. We also conclude, after review of the record of the trial, that there is no reason to grant the defendant relief pursuant to G. L. c. 278, § 33E. We shall, however, vacate the defendant's conviction and sentence on the armed home invasion charge that resulted in the victim's death because it is duplicative of his conviction of first degree felony-murder. See *Commonwealth* v. *Scott*, 428 Mass. 362, 369-370 (1998). The remainder of the defendant's convictions are affirmed.

The opinion will proceed in the following fashion. We shall first set forth the facts that the jury could have found based on the Commonwealth's evidence and based on the defendant's evidence. We shall next identify the elements of the crime of armed home invasion, which was the predicate felony for the felony-murder charge, and then state the Commonwealth's and defendant's theories as to that felony. With this background in place, we shall discuss the defendant's arguments that the jury instructions contained errors that require a new trial.

(a) The Commonwealth's evidence painted the following picture for the jury. Denise Bettinger and her five year old son, Derek, lived in an apartment on the second and third floors of a house at 140 Alley Street in Lynn. They were the only ones living in the house, as the apartment on the first floor was empty. The defendant was a friend of Bettinger and babysat for Derek on a full-time basis. On October 3, 1995, Bettinger, Derek, and another friend, Gary Twyman, who was a Lynn police officer, spoke to a sexual assault officer at the Lynn police station, concerning accusations that the defendant had sexually assaulted

---

[1] The jury rejected the Commonwealth's additional theory that the defendant was guilty of first degree murder by reason of deliberate premeditation.

[2] The defendant was found guilty of armed home invasion (two counts); of armed assault with intent to kill (on an indictment charging armed assault with intent to murder); and of assault and battery by means of a dangerous weapon (a knife). The defendant was acquitted on a second indictment charging assault and battery by means of a dangerous weapon (mace).

Derek. The defendant was subsequently informed of the allegations and was told that, while he was not under arrest, the investigation would continue, and criminal complaints could be brought against him. The defendant was told by the police that he could contact Bettinger by telephone, but that he was to have no physical contact with Bettinger or Derek.

During the evening of October 8, the defendant had been drinking beer and had taken approximately twenty Xanax pills. In the early morning hours of October 9, he decided to go to Bettinger's apartment to talk to her. He took with him his knife[3] and a canister of mace, attached to his key ring. When he arrived at Bettinger's house, he saw Twyman's automobile and Dennis Escott's automobile parked outside (Dennis Escott is Derek's father). The defendant expected both men to be upstairs with Bettinger, but he did not change his mind about going to see her. The defendant entered the house through an unlocked door and proceeded up the stairs to Bettinger's apartment. As he knocked at the apartment door, his knife was in its sheath down one leg of his pants, and his hand was on the canister of mace.

Inside the apartment, Bettinger, Twyman, and Escott were watching television and smoking marijuana. Derek was sleeping on the second floor of the apartment, which is actually the third floor of the house. At approximately 1:30 A.M., there was a knock on the back door of the apartment leading into the kitchen. Escott walked through the unlighted kitchen to answer the door. He had no weapon in his hand. As he opened the door about one quarter inch, someone "barged into the house," "kick-[ing the door] with the force of his whole body." As Escott fell to his knees, he was sprayed with mace. Bettinger identified the defendant as the person forcing his way into the kitchen. At this point Escott's eyes were burning, and he could barely see. He did not recognize his attacker. Escott and the defendant grabbed each other and fell down the stairs to the first floor of the apartment house. The two began throwing punches. Escott, now realizing who the intruder was, said, "You molested my son." At this point, Twyman came down the stairs. In the darkness, Escott pointed out to Twyman where the defendant was standing in the corner against the exterior door. After feeling a stab around the top right side of his buttocks, Escott crawled up the

---

[3]The knife could be considered a short sword. It was an oriental style weapon, with a twelve-inch blade, kept in a wooden sheath.

stairs and collapsed at the top. Bettinger was in the kitchen dialing 911 when she saw Twyman enter, bleeding heavily, and collapse. She then heard the defendant say from downstairs, "I did not touch that boy. I loved that boy. I didn't do anything." A neighbor noticed a male step out onto the porch in the back of 140 Alley Street and heard him yell, "Fuck you and your son[]." Twyman was subsequently taken to a hospital where he died following surgery. Police found the knife sheath lying inside the entrance of the first floor landing, a pair of crushed eyeglasses lying behind the entrance door, a black knit cap in the first floor hallway, and the defendant's bloody jacket on the back porch of the house. There was blood all over the hallway and up the stairs leading to the apartment.

Shortly thereafter, the police stopped the defendant walking along the Lynnway. The defendant pulled out the knife and raised it over his head. Ordered to drop the knife, the defendant repeatedly refused, and resumed walking. The police disabled the defendant by shooting him in the leg, took him into custody, and transported him to a hospital.

(b) The defendant's evidence portrayed the incident as occurring in the following fashion. The defendant was a friend of Bettinger and often babysat for Derek. He loved Bettinger and viewed himself as a father figure to Derek. Escott had been upset that Derek was spending so much time with the defendant. On October 4, 1995, the defendant went to the Lynn police station at the request of a sexual assault officer. There, he learned that he had been accused of sexually assaulting Derek. The defendant denied the charge and was told that, while he was not under arrest, the investigation would continue, and that he was to have no contact with Bettinger or Derek. The defendant was also told that he could call Bettinger by telephone, but that if she did not wish to speak with him, he should have no further contact with her.

Over the next few days, the defendant became obsessed with the allegations against him. He was afraid he was going to be arrested, and because he feared retaliation by Bettinger's friends, he carried a weapon, either a baton or a knife. He tried unsuccessfully to get in touch with Bettinger. On October 8, he stayed home, thinking about the allegations. He wanted to talk with her to "straighten everything out." The defendant thought that Escott and Twyman may have instigated the allegations. During the evening he was drinking and took approximately twenty Xanax pills.

The defendant decided to go to Bettinger's apartment to see if he could resolve the situation. He took a canister of mace with him, which he always carried on his key ring for protection. The defendant also carried his knife, which he testified he thought he might need for protection, down one leg of his pants. He did not take out the knife before he went into the house because he "wasn't over there to hurt anybody with it." Although he still had a key to Bettinger's apartment, he did not take it with him.

On the night of October 8, Escott had been spending the weekend at Bettinger's. Between 11:30 P.M. and midnight, he drank three or four beers at a restaurant, and on the way back to Bettinger's "did a couple of lines" of cocaine. At the apartment, right before the defendant arrived, Bettinger, Escott, and Twyman smoked marijuana.

When Escott answered the defendant's knock, he opened the apartment door "all the way up." The defendant saw Twyman in the kitchen. Escott said to the defendant, "You got the fucking balls coming over here. You molested my son." Escott then came toward the defendant, who tried to spray Escott with the mace. Escott "jumped right on top of [him]," and the next thing the defendant remembered "was going down the stairs." The defendant's glasses either fell off or "got punched off." The defendant's knife fell out of his pants. He recovered the knife and started swinging it because he was getting beaten. The defendant felt the knife hit something, but did not know exactly what. The light in the back stairway was broken, so it was dark at the bottom of the stairs. He thought that only Escott was downstairs and was not aware of Twyman's presence. After the struggle stopped, the defendant was pushed out the door onto the porch. After his arrest, the defendant gave a written statement to the police that generally supported his claims that he had not entered the apartment and had acted in self-defense.

(c) The crime of armed home invasion has four elements. To obtain a conviction of the crime, the Commonwealth must show that the defendant (1) "knowingly enter[ed] the dwelling place of another"; (2) "knowing or having reason to know that one or more persons are present within" (or entered without such knowledge but then remained in the dwelling place after acquiring or having reason to acquire such knowledge); (3) "while armed with a dangerous weapon"; and (4) "use[d] force or threaten[ed] the imminent use of force upon any person within

such dwelling place whether or not injury occur[red], or intentionally cause[d] any injury to any person within such dwelling place." G. L. c. 265, § 18C.

(d) There was no dispute as to the second and third elements of the offense — that the defendant was armed with a dangerous weapon or weapons and that, when he approached the house at 140 Alley Street, he knew, or had reason to know, that Bettinger and others were inside her apartment. The evidence at trial concerned the first and fourth elements. As to the first element, the Commonwealth maintained that the entire house was Bettinger's dwelling, and that the defendant entered (at the earliest) when he entered the house through an unlocked door, or (at the latest) when he forced his way into Bettinger's apartment. As to the fourth element, the Commonwealth asserted that the defendant used force on persons in the apartment when he assaulted Escott with mace and in his attacks with the knife on Escott and Twyman.

On the other hand, the defendant contended that his entry into the hallway of the two-family house through an unlocked door was not an entry into a dwelling, and that he had not entered Bettinger's apartment at all because he was met, and attacked, at the entrance by Escott. Thus, the defendant says that the first element of the armed home invasion had not been shown. The defendant also contended that he had exercised self-defense with nondeadly force when he used the mace to ward off Escott, and self-defense with deadly force when the fight continued to the bottom of the stairs and he fatally stabbed Twyman.[4] So, the defendant reasons, on proper instructions, the jury could have acquitted him on the armed home invasion charges because the Commonwealth had not disproved self-defense. The defendant also alleges that proper instructions on self-defense and reasonable provocation could have resulted in a manslaughter conviction on the killing. We are now in a position to resolve the defendant's arguments.

1. The defendant's trial counsel asked the judge during the charge conference to rule as matter of law that the defendant's entry into the house through an unlocked door, and his use of

---

[4]The defendant's testimony indicated that he thought he was fighting with Escott at the bottom of the stairs and was not aware that Twyman was there. His theory of self-defense, therefore, involved transferred intent, namely, that his right of self-defense against Escott's attack had transferred to Twyman, whom he thought was Escott.

the stairway to reach Bettinger's apartment, was not an entry under G. L. c. 265, § 18C, because the stairway was accessible to anyone and the dwelling itself began only where Bettinger had "implemented something to exclude the public." The judge rejected the requested ruling, and she charged the jury that they had to decide "what comprise[d] the dwelling house here," based on the evidence and certain nonexclusive factors she enumerated for them.[5]

The judge instructed correctly. The jury had seen the house on their view, both inside and out, and they had evidence concerning its interior configuration. Although the house was a two-family building, it was, at the time of the incident, occupied only by Bettinger. The jury heard evidence concerning what doors, inside and outside, were locked. The "term 'dwelling house' as used in the context of burglary always has been construed broadly," *Commonwealth* v. *Goldoff*, 24 Mass. App. Ct. 458, 462 (1987), and, for purposes of the burglary statute, "an apartment dweller's 'dwelling house' does include secured common hallways." *Id.* at 463. The court went on to say that, "as the physical features of a multi-family residential structure will vary from case to case, so too will the determination whether the common areas of that structure, even if locked, constitute the tenant's 'dwelling house.' " *Id.* These conclusions also apply to G. L. c. 265, § 18C, and the jury were properly told to decide as an issue of fact what constituted Bettinger's dwelling, even though the defendant had entered the house through an unlocked door and used an interior stairway to get to the apartment.

2. The judge instructed the jury on the elements of murder in the first degree by means of deliberate premeditation and went on to define correctly the four elements of the crime of armed home invasion and the elements of felony-murder with that

[5]The judge told the jury: "Factors that you should consider in answering [the dwelling house] question include, but are not limited to, what were the areas in the exclusive control of the occupants? What areas were secured or locked from the general public? What areas were open to the general public? Who had access to any common stairwells or hallways and whether those areas were secured or not?"

The jury knew that the defendant was not a stranger to Bettinger and had a key to the apartment, and heard evidence that the defendant went to Bettinger's apartment only to talk to her. Notwithstanding this evidence, the jury properly found that the defendant had entered unlawfully.

crime as the predicate felony.[6] She indicated that the jury had a duty to find the defendant "guilty of the highest crime which the Commonwealth had proved beyond a reasonable doubt." The judge concluded this portion of the charge by stating: "I am instructing you that there is no crime of a lesser-included offense here. There is no second-degree felony murder and there is no manslaughter here." The judge then proceeded to advise the jury that they had to decide the degree of murder; to define the elements of murder in the second degree; to discuss self-defense; and to define manslaughter. The defendant argues that the judge's statement, that there was "no manslaughter here," would have confused the jury and may have adversely affected his defense.

The reference to "no manslaughter here" was a reference to the fact that, if the jury found that first degree felony-murder had been proved, as the judge had just defined that theory of murder, a manslaughter verdict would be excluded.[7] This instruction was correct. See *Commonwealth* v. *Roderick*, 429 Mass. 271, 279 (1999); *Commonwealth* v. *Selby*, 426 Mass. 168, 172 (1997); *Commonwealth* v. *Evans*, 390 Mass. 144, 151 (1983). See also *Commonwealth* v. *Johnson*, 379 Mass. 177, 181 (1979). The defendant's argument has no basis in the law.

3. The judge instructed the jury on self-defense in terms of the use of deadly force. The judge told the jury that they were to consider self-defense by the use of deadly force not only in connection with both theories of murder, but also in connection with the indictment charging the predicate felony of armed home invasion. The defendant argues that the self-defense

---

[6]The defendant argues that the judge should not have instructed the jury that armed home invasion was an inherently dangerous felony for purposes of the felony-murder charge. The instruction was correct. See *Commonwealth* v. *Gruning*, 46 Mass. App. Ct. 842, 847 (1999). We reject the defendant's arguments that we should not follow the conclusion reached in *Gruning*, and that G. L. c. 265, § 18C, cannot constitute a predicate for felony-murder because it does not require an intent to commit a felony at the time of entry.

We also reject at this point the defendant's argument that the so-called merger doctrine, see *Commonwealth* v. *Gunter*, 427 Mass. 259, 273-274 (1998), comes into play to bar his conviction of felony-murder. There was evidence beyond the stabbing of Twyman to support that conviction, including evidence of multiple assaults. See *id.* at 274-275.

[7]The judge was using a blackboard to outline her instructions, and "here" also appears to have been a reference point that drew the jury's attention to the conclusion of the instructions on felony-murder.

instructions were wrong. The defendant frames his contentions in his brief in the following terms:

"The judge erred by . . . instructing the jury [only on the use of deadly force] and by failing to instruct on the use of non-deadly force in self-defense in relation to the home invasion. In effect, the judge completely submerged the defense theory of the case. On the defendant's version of the incident, he was acting in self-defense from the beginning of the incident, when he sprayed the mace at Escott as the latter charged at him. And on the Commonwealth's theory, the home invasion was made out at the beginning of the incident, because the spraying of the mace was the force element of that felony. Thus the jury should have been instructed in a manner that allowed them to consider the two theories and decide whether the Commonwealth had made out its case. Put another way, the jury instructions should have focused their attention on whether the Commonwealth had failed to prove the home invasion because it failed to prove that the defendant was not engaged in the proper use of non-deadly force in self-defense when he sprayed the mace.

"Since the jury were instructed with regard to the home invasion only on the use of *deadly* force in self-defense, the jury would have focused not on the macing — clearly non-deadly force — as the fourth element of the felony, but on the deadly force, the use of the knife at the bottom of the stairs, as constituting the fourth element. Thus the judge's instructions, instead of leading the jury to a consideration of this very brief incident as a continuum — as it had to be viewed on either the prosecution or the defense theory — led the jury to parse and distort the incident and apply the wrong law to it."[8] (Emphasis in original and footnote omitted.)

The argument is misplaced. As has been discussed, the jury were correctly instructed on the element of unlawful entry under G. L. c. 265, § 18C. The jury were also correctly instructed on the other elements of armed home invasion and on the elements

---

[8]The defendant's trial counsel made an objection to the judge's proposed instructions on self-defense at the charge conference, contending that the instructions were at variance with the defendant's theory of self-defense.

of felony-murder. We have stated that "[s]elf-defense is not an available defense to a charge of armed assault in a dwelling house with intent to rob." *Commonwealth* v. *Doherty*, 394 Mass. 341, 351 n.12 (1985). We hold that self-defense is also not available to a charge framed under G. L. c. 265, § 18C. Thus, the predicate felony was established once the jury found that the defendant had unlawfully entered the dwelling (no matter where they found the entry to have occurred), and had used force, or threatened the use of force, on Escott or Twyman, and self-defense could not be claimed by the defendant to justify his use of force. Put differently, an armed home invader (by definition a person who has unlawfully entered a dwelling while armed with knowledge of persons therein) cannot invoke self-defense when an occupant of a dwelling uses force to repel him. Self-defense was pertinent, of course, to the theory of premeditated murder (which the jury rejected), and to the other charges of armed assault and assault and battery by means of a dangerous weapon. The judge's instructions with respect to the use of nondeadly and deadly force in self-defense on those charges were basically correct.[9] The judge's instructions permitting the jury to consider self-defense by the use of deadly force on the armed home invasion charge granted the defendant a benefit to which he was not entitled.

4. The defendant argues that the judge's instructions on manslaughter were erroneous in several respects. The defendant's arguments need not be discussed in detail. The manslaughter instructions were pertinent to the Commonwealth's theory that the defendant had committed murder in the first degree by reason of deliberate premeditation. The jury rejected that theory. As has been discussed, manslaughter was not available as a permissible verdict to the felony-murder charge which was based on an armed home invasion. Because the jury found the defendant guilty of felony-murder, any errors in the manslaughter instructions were inconsequential.[10]

5. There is no reason to apply G. L. c. 278, § 33E, to grant the defendant relief from the murder conviction. The defendant, fueled by alcohol and Xanax pills, went to Bettinger's apart-

[9]The instructions could have been more precise on the issue of transferred intent. We have no doubt, however, that the jury understood that the defendant thought he was fighting Escott when he was in fact fighting Twyman.

[10]For what it is worth, the errors in the manslaughter instructions would not, in any event, provide a basis for ordering a new trial.

ment with both mace and a knife, after he had been told by the police to stay away, and, as the jury found, committed an armed home invasion during which Twyman was killed and Escott wounded. The felony-murder conviction is warranted by the evidence and consonant with justice.

6. The defendant is not entitled to have both convictions of armed home invasion vacated on the ground that they are duplicative of the felony-murder conviction. Each charge alleged a separate and distinct offense, and, when proved, constituted a separate conviction under G. L. c. 265, § 18C. See *Commonwealth* v. *Levia*, 385 Mass. 345, 348, 351 (1982). The defendant's conviction and sentence on one count of the armed home invasion indictment with respect to Gary Twyman, the murder victim, is, however, duplicative. The conviction on that count is vacated, the verdict is set aside, and that count of the indictment is dismissed. The remaining convictions are affirmed.

*So ordered.*